UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDMUND J. MANSOR and | ) | |
| ROBERTA M. MANSOR, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | NO. 12-10544-JGD |
| | ) | |
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT'S MOTION TO DISMISS AND TO STRIKE

April 26, 2016

DEIN, U.S.M.J.

### I.  INTRODUCTION

This putative class action arises out of a 150 million dollar Ponzi scheme, which was

perpetrated by an entity known as Millennium Bank and its principal, William Wise ("Wise"),

and was implemented using accounts that had been opened at Washington Mutual Bank

("WaMu").  The plaintiffs, Edmund J. Mansor and Roberta M. Mansor (the "Mansors"), claim

that they and other similarly situated investors were victims of the Millennium Bank fraud.  In

September 2008, WaMu was acquired by the defendant, JPMorgan Chase Bank, N.A.

("JPMorgan" or "Bank").  By their claims in this action, the Mansors are seeking to hold

JPMorgan liable for assisting Wise and his associates in carrying out their fraudulent scheme

after the Bank allegedly learned of their unlawful activities, and for failing to alert law

enforcement and shut down the Millennium-related accounts before the perpetrators could

transfer and abscond with investor deposits.  After this court dismissed the First Amended

Verified Class Action Complaint without prejudice, the Mansors filed a Second Amended

Verified Complaint (Docket No. 340) ("Complaint") against JPMorgan.  By their present

Complaint, the Mansors have asserted claims against the defendant, on behalf of themselves

and all others similarly situated, for aiding and abetting common law fraud (Count I) and for

negligence with knowledge of fiduciary relationship (Count II).

The matter is presently before the court on the "Defendant's Motion to Dismiss Second

Amended Complaint and Motion to Strike."  (Docket No. 345).  By its motion, JPMorgan is

seeking an order, pursuant to Fed. R. Civ. 12(b)(1), 12(b)(6), 9(b) and 12(f), dismissing the

Complaint with prejudice and striking all allegations that reflect the plaintiff's use of privileged

information.  In the alternative, JPMorgan requests that the court enter an order limiting the

scope of the proposed class so that it includes only "those investors (1) who were actually

defrauded by Millennium Bank, and (2) whose funds were deposited with [JPMorgan] (as

opposed to some other bank) between October 8, 2008 and February 26, 2009 and whose

injuries were caused by [the defendant]."  For all the reasons detailed below, the defendant's

motion is ALLOWED IN PART and DENIED IN PART.  The plaintiffs' claim for negligence shall be

dismissed, but the motion is otherwise denied.  However, nothing herein shall preclude

JPMorgan from challenging the scope of the proposed class again at a later stage in the

proceedings.

## II.  STATEMENT OF FACTS

### Scope of the Record

When ruling on a motion to dismiss, the court must accept as true all well-pleaded facts, and give the plaintiffs the benefit of all reasonable inferences.  See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

In the instant case, the plaintiffs have attached a large number of documents as exhibits to their Complaint.  Generally, under the applicable standard, it would be appropriate for the court to consider such documents in connection with the motion to dismiss.  See Giragosian v. Bettencourt, 614 F.3d 25, 27-28 (1st Cir. 2010) ("In assessing a rule 12(b)(6) motion to dismiss, [court] may consider, in addition to the complaint itself, a limited array of additional documents such as any that are attached to the complaint").  However, the defendants have moved to strike Exhibits 9 through 14B, as well as all of "the allegations drawn therefrom," on the grounds that they are privileged, or potentially privileged, under the Bank Secrecy Act ("BSA") and related regulations.  (Def. Mem. (Docket No. 346) at 5-6).  Because this court finds that the challenged material is not privileged, the motion to strike is denied.

"[W]hen considering a motion to strike, those portions of a complaint that make use of privileged [information] may be removed from the complaint."  Sims v. Roux Labs., Inc., Civil Action No. 06-10454, 2007 WL 2571941, at *1 (E.D. La. Aug. 31, 2007).  See also Otero v. Vito, No. 5:04CV211DF, 2005 WL 1429755, at *1-2 (M.D. Ga. Jun. 15, 2005) (striking information from Amended Complaint on grounds of privilege).  Here, however, JPMorgan cannot establish that the challenged documents and allegations are privileged under the controlling authority.  On December 23, 2013, this court issued a detailed order in which it ruled that the exhibits at issue were not shielded by the BSA or its implementing regulations, and that the plaintiffs were free to rely on them in connection with the present litigation.   (See Docket No. 190 at 4-5, 30-31).  JPMorgan subsequently challenged that ruling by filing a petition for a writ of mandamus with the First Circuit Court of Appeals, and on August 21, 2015, the First Circuit issued a decision denying JPMorgan's petition.  See In re JPMorgan Chase Bank, N.A., 799 F.3d 36, 37 (1st Cir. 2015).

Significantly, in its decision, the First Circuit questioned whether the BSA's disclosure limitations would apply at all to parties, like the named plaintiffs, who represent neither a reporting financial institution nor a government entity.  See id. at 41-42.  It also questioned whether the Act's disclosure limitations would apply at all to the factual circumstances presented in this case.  See id. at 42-43.  More importantly, the First Circuit ruled that even assuming the BSA's disclosure limitations were to apply in this case, the documents JPMorgan was seeking to protect, including documents attached to the present complaint, would "fall outside the scope of that so-called 'privilege.'"  Id. at 43.  Thus, the court found that "none of the documents at issue constitute a draft [suspicious activity report ("SAR")], and none of the

documents reflect the decision-making process as to whether a SAR should be filed, the process of preparing a SAR, or an attempt to explain the content of a SAR post-filing." Id. at 44.   It also rejected JPMorgan's "invitation to view the 'privilege' as extending to any document that might speak to the investigative methods of financial institutions." Id.   In light of these rulings, JPMorgan cannot establish that any of the documents attached to the Complaint, or any allegations drawn therefrom, are privileged or "potentially privileged" under the law of this Circuit.   Therefore, its motion to strike the plaintiffs' exhibits and allegations is denied.[1]   The relevant facts, viewed in the light most favorable to the plaintiffs, are as follows.

### WaMu's Alleged Role in the Millennium Bank Ponzi Scheme

As described above, this case arises out of the fallout from a $150 million Ponzi scheme known as "Millennium Bank," which was carried out by Wise and two of his associates, Jacqueline Hoegel and her daughter, Kristi Hoegel (collectively, the "Hoegels").   (Compl. at Introduction & ¶ 8).   The scheme, which was directed mainly at U.S. citizens, involved the sale

---

[1]  JPMorgan argues that Exhibit 9 to the Complaint should be deemed privileged in this case because a court in the Western District of Missouri determined, in the pending matter of Faughn v. JPMorgan Chase Bank, N.A., that it contains information that is privileged under the BSA.  (See Def. Mem. at 5-6). This court declines to adopt the Faughn court's ruling.  Exhibit 9 consists of the March 23, 2009 Declaration of Casey Stein.  At all relevant times, Mr. Stein was a Compliance Manager in JPMorgan's AML Ops Unit.  His Declaration was filed in the District Court for the Northern District of Texas, in connection with a civil enforcement action that the Securities and Exchange Commission brought against the perpetrators of the Millennium Bank scheme in 2009.  (See Docket No. 190 at 6-8).  At the time it was filed in the Texas action, Mr. Stein's Declaration was not subject to any protective orders or confidentiality agreements.  (Id.).  Accordingly, the information contained therein is a matter of public record.  Furthermore, JPMorgan has not shown why any portion of Mr. Stein's Declaration falls within the scope of the BSA privilege, as interpreted by this court and the First Circuit Court of Appeals.  As the First Circuit described in its decision denying JPMorgan's petition for a writ of mandamus, "the key query" for purposes of determining whether a document falls within the scope of the so-called BSA privilege is whether the "document[] suggest[s], directly or indirectly, that a SAR was or was not filed." In re JPMorgan Chase Bank, N.A. , 799 F.3d at 43.  Because Mr. Stein's Declaration makes no such suggestion, there is no basis for deeming any part of it privileged under the controlling authority.

of bogus certificates of deposit ("CDs") bearing unrealistically high interest rates.  (Id. ¶¶ 9-10).

In order to carry out their fraudulent activities, Wise and the Hoegels set up three fictitious

limited liability companies under the names "UT of S, LLC," "United T of S, LLC" and "Sterling

I.S., LLC."  (Id. ¶ 11).  Allegedly, they also used the accounts and services of two WaMu bank

branches located in Napa, California to negotiate, launder and ultimately abscond with millions

of dollars of deposits that they had collected from unsuspecting investors.  (See id. ¶¶ 12, 15-

17).  The Mansors claim that between April 2008 and January 2009, they paid a total of

$215,000 to Wise and the Hoegels, all of which was deposited into the Millennium accounts.

(Id. ¶¶ 50, 54).  They further claim that they and other similarly situated investors were victims

of the Millennium Bank fraud.  (See id. ¶¶ 49-50, 54-55).

       According to the plaintiffs, employees working in WaMu's two Napa, California branches

acquired specific knowledge of the illegal activities, and willingly assisted the perpetrators of

the Millennium Bank fraud in carrying out their Ponzi scheme.  (See id. ¶¶ 13-32).  Thus, the

plaintiffs allege that the Hoegels, acting at Wise's direction, sought out the managers of the two

branches, Tamara Williams ("Williams") and Bianca Groves ("Groves"), and fostered close

relationships with both women so that Williams and Groves would want to cooperate and assist

them with their unlawful account activities.  (Id. ¶ 13).  Wise, too, visited the Napa branches

and got to know Williams and Groves.  (Id. ¶ 15).  Initially, however, Wise devised a fictitious

storyline to tell to the WaMu employees.  (See id. ¶ 14).  Specifically, Wise and the Hoegels

allegedly informed Williams, Groves and their respective staff members that they "did not sell

securities or other investment products, but were an intermediary for wealthy clients, who

desired to invest without divulging their identity, much like a trust company."  (Id. ¶ 14).  The

plaintiffs claim that despite the alleged storyline, Williams and Groves were able to "observe[ ] on a daily basis the activities being carried out by the Millennium perpetrators," and thus gained specific knowledge regarding their fraudulent conduct.  (Id. ¶ 18).  They also claim that the two women routinely assisted Wise and the Hoegels by facilitating requests to wire investor funds from the Millennium accounts to other locations.  (Id. ¶ 15).

Allegedly, both Williams and Groves observed and commented upon the large volume of checks that were deposited into the Millennium Bank accounts.  (Id. ¶ 18).  According to the plaintiffs, those checks contained memos describing the terms and interest rates of CDs, which the Millennium Bank investors believed they were purchasing.  (Id. ¶¶ 18-19).  In addition, Williams and Groves allegedly were able to see that Wise and the Hoegels used none of the incoming funds for any legitimate banking or other investment activity.  (Id. ¶ 18).  Instead, they simply transferred funds from the WaMu accounts to various offshore accounts that were held in their own names, or in names of various family members.  (Id. ¶ 17).

As described in the Complaint, Groves and Williams also were instrumental in enabling Wise and his associates to carry out their fraudulent enterprise.  For instance, the plaintiffs claim that in early 2008, Williams informed Kristi Hoegel that she had received calls from bank investigators who were performing audits of the Millennium accounts and requesting information about the nature of Wise's business.  (Id. ¶ 19).  Allegedly, Williams voiced concern about the volume of checks that were being deposited into the Millennium accounts, as well as the memos on the faces of the checks relating to the terms and interest rates of CDs, and she advised Kristi regarding steps she could take to "get the investigators 'off your backs.'"  (Id. ¶¶ 19-20).  In addition, Williams allegedly expressed a desire to assist Wise and the Hoegels

"'so you won't get caught[,]'" and suggested ways in which they could adjust their banking activities in order to reduce their presence at the WaMu branches and avoid further scrutiny. (Id. ¶¶ 20-23).  In particular, the plaintiffs claim that Williams encouraged Wise and the Hoegels to install remote wiring services, which would enable them to wire funds directly from their office.  (Id. ¶ 21).  She later advised Kristi Hoegel to contact Groves and apply for a Remote Deposit Capture ("RDC") system, which would allow Wise and the Hoegels to deposit investor checks into the Millennium accounts without the need to visit either of the WaMu branches. (Id. ¶¶ 22-23 ).  A remote wire transfer service was installed, under Groves' supervision, in the spring of 2008, and an RDC system was installed on about September 16, 2008.  (Id. ¶¶ 21, 24).

Within days after the RDC system was installed in Millennium Bank's Napa office, checks deposited through the system were being returned.  (Id. ¶ 25).  Kristi Hoegel allegedly inquired about the problem, and was referred to a Business Treasury Services Specialist in Seattle, Washington, who advised her to take the returned checks to a WaMu branch for deposit.  (Id. ¶ 25).  The Services Specialist also informed Kristi that if the checks were returned at the branch level, she would need to find out "what restraint or department has some kind of note on your account and get it removed."  (Compl. Ex. 3).  Allegedly, Kristi then contacted Williams, who determined that a restraint had been placed on the Millennium accounts, as well as on personal accounts that Kristi and Jacqueline Hoegel maintained at WaMu.  (Compl. ¶ 26).  According to the Complaint, Williams then promised Kristi that she would get the restraints removed.  (Id.).

The plaintiffs claim that suspicious activity in the Millennium accounts triggered alerts within WaMu's internal monitoring system, and led to periodic investigations by personnel in WaMu's investigatory units beginning as early as 2006.  (Id. ¶¶ 33-34).  Those units included

WaMu's Financial Intelligence Unit ("FIU"), which was located in Stockton, California, and its Anti-Money Laundering Operations Unit ("AML Ops Unit"), which was located in San Antonio, Texas.  (Id. ¶ 33).  As a result, various individuals working in WaMu's FIU and AML Ops Unit allegedly learned of the suspicious deposits and wire activity in the Millennium Bank accounts.  (See id. ¶¶ 34, 38).  Nevertheless, they took no action to disrupt the suspicious activity or to protect the Millennium Bank investors.

### JPMorgan's Acquisition of WaMu

On September 25, 2008, the United States Office of Thrift Supervision seized WaMu and placed it into receivership with the Federal Deposit Insurance Corporation ("FDIC").  See Yeomalakis v. F.D.I.C., 562 F.3d 56, 59 (1st Cir. 2009).  On that same day, the FDIC sold certain of WaMu's assets to JPMorgan.  See id.  Those assets included the Millennium Bank accounts, as well as the two Napa branches where Wise and the Hoegels had allegedly been carrying out their fraudulent banking activities.  (Compl. ¶ 28).  Accordingly, all of the Napa branch employees, including Williams and Groves, became employees of JPMorgan.  (Id. ¶ 29).  Within days of the acquisition, Williams allegedly called Kristi Hoegel to inform her that Williams had been successful in getting the restraints removed from all of the Millennium-related accounts.  (Id. ¶ 30).  During the conversation, Williams allegedly "voiced her concerns about all of them 'getting caught.'"  (Id.).

In connection with its acquisition of WaMu's assets, JPMorgan took control of WaMu's FIU and AML Ops Unit, including investigative files that had been compiled by those units as part of their investigation of the Millennium-related accounts.  (See id. ¶¶ 33-34).  In addition, two WaMu compliance managers, Casey Stein ("Stein") and Richard Alaniz ("Alaniz"), assumed

supervisory authority over JPMorgan's ongoing investigations into the Millennium accounts.

(Id. ¶ 34).  According to the plaintiffs, JPMorgan's investigative units completed a review of

those accounts on October 8, 2008.  (Id. ¶ 43).  They further claim that "JPMorgan had specific

and actual knowledge of Millennium's fraudulent activities" by that time.  (Id. ¶ 43).

Specifically, the plaintiffs allege that by October 8, 2008, JPMorgan knew that Wise and Kristi

Hoegel had opened accounts in the names of two of the limited liability companies at a WaMu

branch in Las Vegas, Nevada, and that internal monitoring systems within the Bank had

detected "voluminous and unusual deposits and outgoing domestic and international wire

activity" in those accounts.  (Id. ¶¶ 51-52).  They further allege that despite its discovery, the

Bank failed to take any affirmative steps to notify law enforcement or to shut down the

Millennium-related bank accounts.  (Id. ¶ 45).

        The plaintiffs acknowledge that JPMorgan placed new restraints on the Millennium

accounts in October 2008, and again in January and February 2009.  (Id. ¶ 31).  Each time,

however, Kristi Hoegel allegedly contacted Williams, and Williams allegedly took steps to have

the restraints on the accounts removed.  (Id.).  According to the plaintiffs, "[t]here is no doubt

that [Williams] knew and understood that Wise, and the Hoegels were involved in a fraudulent,

illegal enterprise at that time, but elected to help them anyway."  (Id. ¶ 32).  Therefore, they

claim that Williams, now an employee of JPMorgan, knowingly assisted the perpetrators of the

fraud in carrying out their unlawful enterprise.

### Continuing Investigations of the Millennium Bank Accounts

        The record establishes that suspicious activity in the Millennium accounts continued to

trigger investigations by the Bank's AML Ops Unit, and that by late February 2009, JPMorgan

had compiled a 441-page file containing the results of an investigation for the period from

October 8, 2008 to February 20, 2009.  (See id. ¶¶ 39-40).  As a result of that investigation,

Stein and other members of the AML Ops Unit learned of unusual activity in the accounts

involving the "rapid movement of funds and international wire transfers to countries with an

increased risk for potential money laundering." (Id. ¶ 39).  They also determined that a large

portion of the funds that were deposited into those accounts "were being redistributed to

Wise, Hoegel, and their apparent relatives[.]" (Id.).  As Stein later described in a Declaration

that he provided to the Securities and Exchange Commission ("SEC"):

> The UT of S, LLC Account activity reflects many "remote items deposits"
> and customer deposits in significant amounts, followed by large outgoing
> domestic and international wires to various individuals, including Wise,
> Hoegel, apparent family members, and entities and businesses controlled
> by Wise and/or the Hoegels.  The remote items deposited in the UT of S,
> LLC Account consist of transit checks from various individuals.  The memo
> lines on the checks typically include references to "CD" and interest rates
> ranging from 6.75% to 10%.

(Compl. Ex. 9 ¶ 5).

On February 26, 2009, Stein initiated the closure of the Millennium accounts on an

expedited basis, and directed another Bank employee to notify Jason Richards, a Special Agent

with the FBI.  (See Compl. Exs. 26 & 29).  One day later, Stein was informed that restraints had

been placed on all of the accounts and associated customers.  (Compl. Ex. 29).  For some reason

that is not explained in the Complaint, however, Stein then requested that the restraints be

removed, and that the accounts be processed "as normal closures[.]" (Id.).  The plaintiffs claim

that the restraints were lifted, and the closures postponed, "again with [Williams'] direct

involvement[.]" (Compl. ¶ 47).  However, the record demonstrates that Williams did not

inquire about the restraints until March 10, 2009, by which time the accounts had again been frozen.  (See Compl. Ex. 28).

At Stein's direction, on February 27, 2009, the Small Business Manager of the Bank's Napa Valley branch conducted a physical inspection of UT of S, LLC's office in Napa, California. (Compl. ¶ 39; Compl. Ex. 9 ¶ 7).  During the inspection, the Small Business Manager observed that the UT of S office had no signage, but that the RDC machine was located on the premises. (Compl. Ex. 9 ¶ 7).  The Small Business Manager also overheard a receptionist ask a caller if he or she wanted to roll over a matured CD into a new one.  (Id.).  Later that day, Stein resumed the investigation by placing a telephone call to Kristi Hoegel.  (Compl. Ex. 9 ¶ 8).  Stein reported that during the conversation, Hoegel confirmed that Wise was her boss, that Wise owned UT of S, and that UT of S owned Millennium Bank.  (Id.).  She also stated, among other things, that her business did not offer CDs, she was not licensed to offer CDs, and she did not know why the memo section of the checks that were deposited into UT of S, LLC's account referred to CDs and interest rates.  (Id.).

In the meantime, the SEC was conducting its own investigation of Millennium Bank, and on March 4, 2009, it served JPMorgan with a subpoena for documents relating to UT of S LLC and Sterling IS LLC.  (Compl. Ex. 8).  In response to the subpoena, JPMorgan provided the SEC with the results of its investigation into the Millennium accounts.  (See Compl. ¶ 40).  This included the contents of its 441-page investigative file.  (Id.).

The record shows that by early March 2009, employees in JPMorgan's investigative units were describing Millennium Bank as a Ponzi scheme, and were viewing Wise as a crook.  In particular, on March 4, 2009, Gina Ward, a Compliance Specialist in JPMorgan's AML Ops Unit,

sent Alaniz an internet posting in which Millennium was characterized as "a 100% scam" and a "money laundering operation." (Compl. Ex. 24). On March 5, 2009, Alaniz sent an email to Gina Ward in which he described Millennium Bank as a Ponzi scheme. (Compl. Ex. 23). On March 9, 2009, the Bank again froze the Millennium accounts on a temporary basis. (Compl. Ex. 9 ¶ 9). At that time, approximately $34,500 remained in the accounts. (Id.).

On March 10, 2009, one day after the accounts were frozen, Williams contacted Stein to obtain information on how long the funds would be held. (Compl. Ex. 28). Williams was informed that the funds might be held until the end of the month. (Id.). In his Declaration, which was executed on March 23, 2009, Stein confirmed that "[t]he funds will be released and the account closed within the next several days." (Compl. Ex. 9 ¶ 9). Nevertheless, the plaintiffs claim that during the month of March 2009, JPMorgan permitted $500,000 of investor money to flow through the Millennium accounts and be transferred to Wise and the Hoegels. (See Compl. ¶ 48). Therefore, according to the plaintiffs, the Bank allowed Wise and his associates to defraud additional investors. (Id.).

**The End of the Fraudulent Scheme**

The Millennium Bank scheme finally came to an end on March 25, 2009, when the SEC filed a civil enforcement action against Wise and his associates in the United States District Court for the Northern District of Texas. (Id. ¶ 35). By that time, however, Millennium Bank investors had lost millions of dollars. (See id. ¶ 49). The plaintiffs allege that from the time of JPMorgan's acquisition of WaMu on September 25, 2008 to the filing of the SEC action on March 25, 2009, Wise and the Hoegels allegedly deposited close to $17 million of investor money into the Millennium accounts. (Id.). They further allege that as a result of JPMorgan's

failure to notify law enforcement of the ongoing criminal activities, or to shut down the Millennium accounts, Wise and the Hoegels were able to drain the accounts and abscond with nearly all of those funds.  (See id. ¶¶ 49-53).  By their claims in this action, the Mansors are seeking to hold JPMorgan liable for its alleged participation in the events that led to their financial losses, as well as the financial losses of similarly situated investors.

Additional factual details relevant to this court's analysis are provided below where appropriate.

### III.  ANALYSIS

#### A.    Subject Matter Jurisdiction

JPMorgan has moved to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), for failure to comply with the heightened pleading standard set forth in Fed. R. Civ. P. 9(b), and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). "Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case."  Acosta-Ramirez v. Banco Popular de P.R., 712 F.3d 14, 18 (1st Cir. 2013).  Accordingly, this court turns first to JPMorgan's argument that this court lacks subject matter jurisdiction over any claims that relate to WaMu's conduct prior to its acquisition by JPMorgan in September 2008.  (See Def. Mem. at 9).

As this court discussed at length in its Memorandum of Decision and Order on Defendant's Motion to Dismiss the plaintiffs' First Amended Complaint (Docket No. 328), under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1821(d)(13)(D)(ii) ("FIRREA"), federal courts lack subject matter jurisdiction over claims that relate to the acts or omissions of a failed banking institution, but have not been exhausted

through the FDIC's administrative claims process.  See Acosta-Ramirez, 712 F.3d at 19 (finding

that failure to comply with FIRREA's statutory claims process deprives courts of jurisdiction over

claims concerning misconduct of a failed banking institution).  This includes "claims asserted

against a purchasing bank when the claim is based on the conduct of the failed institution"

rather than the purchaser's "independent misconduct[.]"   Benson v. JPMorgan Chase Bank,

N.A., 673 F.3d 1207, 1214-15 (9th Cir. 2012).  In the instant case, it is undisputed that the

Mansors did not present their claims to the FDIC, and did not exhaust the administrative

procedures set forth in FIRREA.  (Docket No. 328 at 7).  Accordingly, this court lacks jurisdiction

over any claims against JPMorgan that "'relate to any act or omission' of" WaMu prior to its

acquisition by the defendant.  See Benson, 673 F.3d at 1215 (quoting 12 U.S.C. §

1821(d)(13)(D)) (punctuation omitted).

The plaintiffs' aiding and abetting claims are based, at least in part, upon WaMu's pre-

purchase conduct.  Thus, for example, the Mansors allege that JPMorgan aided and abetted the

fraudulent Millennium Bank scheme by "[p]roviding strategies to the Hoegels to be used in

their banking activities, which would avoid bank scrutiny of the Millennium Accounts[,]" by

"[p]ermitting remote deposit and remote wiring capabilities to be utilized for purposes of

larcenous activity[,]" and by "[p]roviding remote deposit and remote wiring systems to Wise

and the Hoegels with knowledge that such systems would be used to help steal Millennium

customer funds[.]"  (Compl. ¶ 74).  All of those allegations concern WaMu's installation of a

wire transfer service and an RDC system at the Napa, California office of Millennium Bank, and

not the independent, post-acquisition conduct of JPMorgan.  FIRREA precludes any aiding and

abetting claims that are predicated upon such activities.  See Benson, 673 F.3d at 1215 (finding

that claims which relied on WaMu's alleged wrongdoing were "jurisdictionally barred by FIRREA").

JPMorgan argues that FIRREA also "bars any liability for Williams' alleged offer in September 2008 to lift account restraints" on the Millennium accounts and the Hoegels' personal accounts at WaMu, which occurred shortly following the installation of the RDC system. (Def. Mem. at 9). This court agrees that any such claim is barred by FIRREA as well. The plaintiffs allege that shortly before JPMorgan's purchase of WaMu in late September 2008, Williams determined that a restraint had been placed on the Millennium accounts, as well as on the Hoegels' personal accounts, and she promised Kristi Hoegel that she would have the restraints removed. (Compl. ¶ 26). They also allege that Williams was already taking steps to reverse the freeze on the accounts prior to JPMorgan's acquisition of WaMu on September 25, 2008. (Compl. ¶¶ 27-28). Thus, while the plaintiffs contend that Williams called Kristi Hoegel after the acquisition to report that her efforts had been successful, they cannot escape the fact that the lifting of the restraints in September 2008 was "related to an initial act of WaMu[.]" Lazarre v. JPMorgan Chase Bank, N.A., 780 F. Supp. 2d 1320, 1326 (S.D. Fla. 2011) (rejecting plaintiff's assertion that his claims were predicated solely upon JPMorgan's conduct, and finding that claims were subject to FIRREA, where the conduct at issue related to WaMu's actions). Therefore, any claims based upon such conduct are subject to FIRREA's jurisdictional bar, and must be dismissed.

**B.    Standard of Review Under Fed. R. Civ. P. 12(b)(6) and 9(b)**

JPMorgan does not dispute that FIRREA does not apply to claims based only on the post-purchase misconduct of an acquiring institution, and that the Mansors' claims encompass

conduct that allegedly occurred after the WaMu acquisition.  Nevertheless, JPMorgan argues

that all of those claims must be dismissed for failure to state a claim under Fed. R. Civ. P.

12(b)(6) and for failure to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).

For the reasons described below, this court finds that the Mansors have met the requisite

standards with respect to their claim for aiding and abetting common law fraud, but that their

claim for negligence with knowledge of fiduciary relationship must be dismissed.

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when

confronted with such a motion, the court accepts as true all well-pleaded facts and draws all

reasonable inferences in favor of the plaintiff.  See Cooperman, 171 F.3d at 46.  Dismissal is only

appropriate if the complaint, so viewed, fails to allege "a plausible entitlement to relief."

Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

A claim for aiding and abetting fraud, such as the claim asserted in Count I of the

Mansors' Complaint, "must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)."

Bamberg v. SG Cowen, 236 F. Supp. 2d 79, 91 (D. Mass. 2002).  Consequently, the plaintiff is

required to "plead the elements of aiding and abetting with particularity."  In re Agape Litig.,

773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011) (quotations and citations omitted).  See also Bamberg,

236 F. Supp. 2d at 91 (requiring plaintiffs asserting aiding and abetting claim "to plead with

specificity allegations of fraud sufficient to substantiate their claim that [defendant] substan-

tially assisted or encouraged a fraud").  Rule 9(b) does allow "[m]alice, intent, knowledge, and

other conditions of a person's mind [to] be alleged generally."  Fed. R. Civ. P. 9(b).  However,

"pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts

that give rise to a strong inference of actual knowledge." In re Agape Litig., 773 F. Supp. 2d at

308 (quoting Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367

(S.D.N.Y. 2007)) (internal quotations omitted).

### C.   Count I: Claim for Aiding and Abetting Common Law Fraud

In Count I of their Complaint, the plaintiffs are seeking to hold JPMorgan liable for aiding

and abetting common law fraud.  "[U]nder Massachusetts law liability for aiding and abetting a

tort attaches where: (1) the defendant provides substantial assistance or encouragement to the

other party; and (2) the defendant has unlawful intent, i.e., knowledge that the other party is

breaching a duty and the intent to assist that party's actions."[2] Bamberg, 236 F. Supp. 2d at 90

(quoting Austin v. Bradley, Barry & Tarlow, P.C., 836 F. Supp. 36, 40 (D. Mass. 1993)) (additional

quotations and citations omitted).  This court finds that the plaintiffs have stated an aiding and

abetting claim against JPMorgan, and that the defendant's motion to dismiss Count I must be

denied.

### i.   Substantial Assistance

The Mansors allege that JPMorgan substantially assisted Wise and Hoegels in carrying

out their fraudulent scheme by:

    a.   Providing strategies to the Hoegels to be used in their banking
activities, which would avoid bank scrutiny of the Millennium
Accounts;

    b.   Taking direct actions to reverse restraints placed on the Millennium
Accounts as the result of fraud alerts, so that the illegal customer
activities could continue;

---

[2] The parties do not dispute that the Mansors' claim for aiding and abetting is governed by Massachu-
setts law.  (See Def. Mem. at 13-14; Pl. Opp. Mem.  (Docket No. 350) at 8-9).

    c.   Ignoring or failing to implement established written protocols of the bank intended to prevent customer fraud;

    d.   Failing to initiate expedited account closure procedures at a time when the bank had specific knowledge that the failure to do so would cause larcenous activity to continue;

    e.   Permitting remote deposit and remote wiring capabilities to be utilized for purposes of larcenous activity when purported restraints were in place to prevent such activity;

    f.   Providing remote deposit and remote wiring systems to Wise and the Hoegels with knowledge that such systems would be used to help steal Millennium customer funds; and

    g.   Failing to report known illegal and larcenous activities to law enforcement agencies, in violation of federal anti-money laundering laws, including, but not limited to 12 C.F.R. 21.11(d) and/or 31 C.F.R. 1020.320(b)(3).[3]

(Compl. ¶ 74). This court finds that Williams' alleged efforts to have the restraints removed from the Millennium accounts, "so that the illegal customer activities could continue[,]" is sufficient to constitute substantial assistance at this stage of the litigation, but that the remaining allegations are either based on WaMu's actions or otherwise are inadequate to support a claim for aiding and abetting fraud.

### WaMu's Alleged Assistance

This court finds, as an initial matter, that it lacks subject matter jurisdiction over the Mansors' claim to the extent it is based on the conduct alleged in paragraphs a, e and f. As described above, those allegations concern WaMu's actions in installing the remote wiring and RDC systems at Millennium Bank's Napa, California office prior to the acquisition of WaMu by

---

[3] 12 C.F.R. § 21.11(d) and 31 C.F.R. § 1020.320(b)(3) establish deadlines by which a national bank such as JPMorgan is required to file a SAR following the detection of suspicious activity.

JPMorgan on September 25, 2008.  As further described above, claims based on such pre-purchase conduct are precluded by FIRREA's jurisdictional bar.  The facts alleged in paragraphs a, e and f are therefore insufficient to support a claim for aiding and abetting fraud.

### Alleged Violations of Anti-Money Laundering Laws

To the extent the Mansors' claim is based on alleged violations of federal anti-money laundering laws (paragraph g), it must fail as well.  As this court previously determined in connection with JPMorgan's motion to dismiss the plaintiffs' prior complaint, "relevant authority establishes that there is no private right of action for a bank's failure to report suspicious activity under the federal anti-money laundering regulations."  (Docket No. 328 at 19-20 (citing B.E.L.T., Inc. v. Wachovia Corp., 403 F.3d 474, 476-77 (7th Cir. 2005) (explaining that "no one is entitled to the benefit of regulatory intervention" and dismissing claim premised upon theory that bank "fail[ed] to deem its suspicions grave enough to notify federal law-enforcement officers")).  Consequently, JPMorgan's alleged failure to report suspicious account activity pursuant to the federal anti-money laundering laws and regulations does not support a claim for relief.

### Alleged Failure to Close Accounts or Implement Protocols

With respect to JPMorgan's alleged failure to initiate expedited account closure procedures or to implement established written protocols intended to prevent customer fraud, this court finds that such inaction does not constitute the type of "substantial assistance" necessary to support a claim for aiding and abetting fraud.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach [of a duty] to occur."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 295 (2d Cir.

2006) (quoting <u>Kaufman v. Cohen</u>, 307 A.D.2d 113, 126, 760 N.Y.S.2d 157, 170 (2003)).[4]  As a

general matter, however, "the mere inaction of an alleged aider and abettor constitutes

substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."  <u>Id.</u>

(quoting <u>Kaufman</u>, 307 A.D.2d at 126, 760 N.Y.S.2d at 170).  <u>See</u> <u>also</u> <u>Commonwealth v.</u>

<u>Sylvester</u>, 400 Mass. 334, 339 & n.6, 509 N.E.2d 275, 279 & n.6 (1987) (explaining, in the

criminal context, that acquiescence alone is not sufficient to establish aiding and abetting).  In

the instant case, the plaintiffs have not alleged facts establishing the existence of a fiduciary

relationship between the Bank and the Millennium investors, and there is no legal basis for

finding that such a relationship existed.

Even if it were assumed that JPMorgan owed a duty to the plaintiffs, Massachusetts law

would not support a claim that its duty was fiduciary in nature.  In Massachusetts, a bank's

relationship with its own customers is not a fiduciary one.  <u>Islam v. Option One Mortg. Corp.</u>,

432 F. Supp. 2d 181, 195 (D. Mass. 2006) (under Massachusetts law, "a bank's relationship to its

customers is simply one of creditor and debtor – an arm's length business relationship.  No

fiduciary duty is owed"  (internal quotations, citation, punctuation and italics omitted)).

Logically, therefore, JPMorgan could not have owed any fiduciary obligations to the clients of its

customer.  <u>See</u> <u>Austin</u>, 836 F. Supp. at 38-40 (attorneys had no primary liability or aiding and

abetting liability to investors for failing to disclose knowledge of their client's insolvency where

---

[4]  Although the <u>Lerner</u> court applied New York law to the plaintiffs' claim of aiding and abetting, New
York, like Massachusetts, follows Section 876 of the Restatement (Second) of Torts.  <u>See</u> <u>Lindsay v.</u>
<u>Lockwood</u>, 163 Misc. 2d 228, 232, 625 N.Y.S.2d 393 (1994) (describing New York law of aiding and
abetting, as outlined in the Restatement (Second) of Torts § 876); <u>Payton v. Abbott Labs</u>, 512 F. Supp.
1031, 1035 (D. Mass. 1981) ("the theory of aiding and abetting under Massachusetts law follows the
Restatement [(Second) of Torts] § 876(b).").  Accordingly, the standard is the same under the law of
either state.

attorneys owed no duty to investors).  The plaintiffs have not cited any authority that has held otherwise.

While a failure to act is ordinarily insufficient to constitute substantial assistance in the absence of a fiduciary duty, there is an exception.  "[I]naction on the alleged aider and abettor's part can provide a basis for liability where the inaction was designed intentionally to aid the primary fraud."  In re Agape Litig., 773 F. Supp. 2d at 322 (quoting In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 34 (Bankr. E.D.N.Y. 2006)).  In this case, however, the plaintiffs have not alleged any facts linking JPMorgan's alleged failure to initiate expedited account closure procedures with an intent by the Bank to assist or encourage the Millennium Bank fraud.  Moreover, their own allegations defeat any suggestion that JPMorgan intentionally failed to implement written protocols for preventing customer fraud, much less failed to do so for purposes of assisting the fraudulent scheme.

The plaintiffs claim that the Bank's written protocol in cases of suspected fraud "was to elevate investigative measures, including (a) review of customer profiles, (b) conduct site visits, and (c) direct interviews of customers."  (Compl. ¶ 44).  They also claim that "[u]pon confirma-tion of illegal activities, the protocol was to initiate account closures and to make referrals to law enforcement[.]"  (Id.).  However, their assertion that JPMorgan failed to implement these protocols is entirely inconsistent with other facts contained in the Complaint.  Those facts make it clear that the plaintiffs are objecting to the time it took to conduct the investigation, not to the lack of any investigation.

According to the Complaint, JPMorgan's AML Ops Unit conducted an investigation of the Millennium accounts for the time period from October 8, 2008 to February 20, 2009.  (See id.

¶¶ 39-40).  Stein then directed the Small Business Manager of the Bank's Napa branch to conduct a physical inspection of UT of S, LLC's office, which was subsequently followed by Stein's own interview with Kristi Hoegel.  (Compl. Ex. 9 ¶¶ 7-8).  Moreover, the plaintiffs have alleged facts indicating that the AML Ops Unit initiated the closure of the Millennium accounts, and alerted the FBI to suspicious activity in the accounts, on or about February 26, 2009.  (See Compl. Exs. 26 & 29).  These facts show that the AML Ops Unit carried out all of the appropriate procedures.  Even if, as the plaintiffs' contend, JPMorgan's failure to act sooner enabled Wise and the Hoegels to carry out their fraudulent scheme for a number of months following the defendant's purchase of WaMu, these allegations belie any inference that the Bank's inaction was designed intentionally to aid in the primary fraud.

### Reversal of Restraints

The only remaining allegations of substantial assistance concern Williams' alleged actions in reversing the restraints that had been placed on the Millennium accounts.  Specifically, the plaintiffs claim that Williams was instrumental in reversing restraints that had been placed on the accounts on five separate occasions, including in September and October 2008, and in January, February and March 2009, and that her actions were aimed at assisting Wise and his associates in continuing their unlawful activities.  (See Compl. ¶¶ 26, 30-31, 47, 74.b.).  While this court finds that Williams' alleged intervention in September 2008 and March 2009 is insufficient to establish substantial assistance, her alleged conduct in the intervening months of October 2008, January 2009 and February 2009 is adequate to support an aiding and abetting claim.

As described above, the record establishes that Williams' alleged efforts to lift the restraints on the Millennium accounts in September 2008 related to WaMu's actions. Therefore, FIRREA precludes the aiding and abetting claim to the extent it is predicated upon such conduct. To the extent the claim is based on Williams' alleged conduct in March 2009, this too is insufficient to state a plausible claim for relief. The Complaint establishes that JPMorgan finally froze the Millennium accounts on March 9, 2009, and that Williams contacted Stein the following day to ask how long the funds would be held. (See Compl. Ex. 9 ¶ 9; Compl. Ex. 28). However, there is no indication that Williams had any further involvement with the accounts at that time, or made any subsequent efforts to have the restraints removed. "Only assistance or encouragement that is a 'substantial factor in causing the resulting tort' exposes the actor to liability" for aiding and abetting. Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009) (quoting Restatement (Second) of Torts § 876 cmt. d). Williams' inquiry in March 2009 cannot reasonably be deemed assistance or encouragement, much less a substantial factor in causing the Millennium fraud.

This court finds that Williams' alleged actions in lifting the restraints in October 2008, January 2009 and February 2009 are sufficient to satisfy the substantial assistance requirement. The plaintiffs claim that during the course of her employment at WaMu, Williams acquired specific knowledge of the illegal account activities, but engaged in various efforts to assist Wise and the Hoegels to pursue their fraudulent enterprise. (See Compl. ¶¶ 18-23). Her alleged post-acquisition conduct in removing the account restraints can reasonably be viewed as a continuation of that effort because it would have allowed the Millennium Bank scheme to continue. Accordingly, this court concludes that Williams' alleged conduct constituted the type

of "critical action[ ]" necessary to satisfy the substantial assistance prong of an aiding and

abetting claim.  See Benson, 2010 WL 1526394, at *4 (alleged actions by bank employees,

which allowed Wise and his associates to carry out Ponzi scheme, were sufficient to meet

substantial assistance requirement of aiding and abetting claim).

The defendant argues that these allegations fail to support a claim for relief because

they are not substantiated by any documentation, and do not include enough detail to satisfy

the requisite pleading standard.  (See Def. Mem. at 11).  This court finds these arguments

unpersuasive.  At the pleading stage, the court is obliged to accept the plaintiffs' alleged facts,

and draw all reasonable inferences in the plaintiffs' favor.  See Cooperman, 171 F.3d at 46.

There is no requirement that the plaintiffs present evidentiary support for their allegations that

Williams engaged in repeated efforts to remove restraints on the Millennium accounts.  See In

re Computervision Corp. Sec. Litig., 869 F. Supp. 56, 64 (D. Mass. 1994) (explaining, in securities

fraud context, that Rule 9(b) does not require plaintiff to specify evidence from which fraudu-

lent intent may be inferred).  Moreover, when viewed in the plaintiffs' favor, these allegations

support a reasonable inference that Williams' conduct enabled the Millennium perpetrators to

maintain their illegal Ponzi scheme and abscond with investor funds.  See Benson, 2010 WL

1526394, at *5 (finding that JPMorgan substantially assisted Ponzi scheme by providing

"essential banking services that allowed the Ponzi scheme to continue over a period of time").

No further detail is necessary to establish substantial assistance at this stage in the litigation.[5]

---

[5]  The defendant notes that "a bank may place a restraint on a customer's account for any number of
reasons, including to allow time to ensure there are sufficient funds in the customer's accounts from
which they drew checks, or to protect the bank's customer from fraud committed by *its* customers."
(Def. Mem. at 11 n.13).  Thus, JPMorgan speculates that the alleged restraints may have had nothing to
do with the Bank's detection of suspicious activity in the Millennium accounts, and that Williams'

This court also rejects the Bank's contention that the Mansors have failed to plead substantial assistance because Williams, as a branch-level employee of JPMorgan, was not senior enough to render the defendant liable for her actions. Relying on a concurring opinion in the Fifth Circuit case of United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343 (5th Cir. 2013), JPMorgan argues that "Plaintiffs must show that [Bank] officers and employees '*at a certain level of responsibility imputable to the corporation*' helped perpetuate the fraud while intending to swindle Millennium's investors." (Def. Mem. at 12 (quoting Vavra, 727 F.3d at 355 (Jolly, J., concurring) (emphasis in original)). However, as the Fifth Circuit has further explained, "[w]here the level of responsibility begins must be discerned from the circumstances of each case." F.D.I.C. v. Ernst & Young, 967 F.2d 166, 171 (5th Cir. 1992) (quotations and citations omitted). In the instant case, the plaintiffs claim that Williams was the manager of the Napa, California branch of JPMorgan, with apparent authority to override restraints that had been placed on customer accounts. The question whether her actions can be imputed to JPMorgan is a factual issue that must await further development of the record.[6]

---

alleged actions in lifting the restraints may have been entirely unrelated to the Millennium Bank fraud. However, when all reasonable inferences are drawn in the plaintiffs' favor, the Complaint indicates that the restraints were placed on the Millennium accounts in response to suspicious activity in those accounts. It also indicates that Williams, who had "observed on a daily basis the activities being carried out by the Millennium perpetrators, and thus had specific knowledge of their [fraudulent] conduct[,]" repeatedly took steps to have the restraints removed so that the perpetrators could carry on with their fraudulent scheme. (See Compl. ¶¶ 18-23, 26, 31-34).

[6] JPMorgan argues that it cannot be held liable for Williams' alleged efforts to remove restraints on the Millennium accounts because, under the plaintiffs' theory of the case, more senior officials in the Bank's fraud investigation units continued to place restraints on the accounts after Williams had them removed. (Def. Reply Mem. (Docket No. 352) at 5-6). However, the Complaint can just as easily be viewed as showing that Williams had the authority to override the decisions of investigators in JPMorgan's FIU and AML Ops Unit. Because each employee's role at the Bank and in the management of the Millennium accounts after the acquisition of WaMu remains unclear at this stage in the litigation, any resolution of these issues must await further factual development.

Finally, JPMorgan asserts that "[t]he mere lifting of a restraint to restore access to ordinary banking services does not form the basis for an aiding and abetting claim."  (Def. Mem. at 12; see also Def. Reply Mem. at 12).  Again this court disagrees.  "A bank's provision of 'its usual banking services to a customer . . . does not in and of itself rise to the level of substantial assistance.'"  Weshnak v. Bank of Am., N.A., 451 Fed. App'x 61, 62 (2d Cir. 2012) (quoting Rosner v. Bank of China, No. 06-CV-13562, 2008 WL 5416380, at *12 (S.D.N.Y. Dec. 18, 2008)).  On the other hand, "even ordinary business transactions a bank performs for a customer can satisfy the substantial assistance element . . . if the bank actually knew those transactions were assisting the customer in committing a specific tort."  Benson, 2010 WL 1526394, at *4 (quotations and citations omitted).  When all reasonable inferences are drawn in the Mansors' favor, the alleged facts show that Williams acquired specific knowledge of the fraudulent activities through her own observations and communications with the perpetrators of the Millennium Bank scheme, and that following JPMorgan's purchase of WaMu, she repeatedly took steps to have the restraints on the accounts removed so that the perpetrators could resume their illegal activities.  (See Compl. ¶¶ 18-23, 26, 31-32).  Thus, the factual allegations surrounding Williams' lifting of the restraints is sufficient to establish substantial assistance on the part of JPMorgan.

     **ii.**    **Unlawful Intent**

In order to state a claim for aiding and abetting common law fraud, the plaintiff also must allege facts showing that the defendant possessed "an 'unlawful intent.'"  Taylor, 576 F.3d at 35 (quoting Payton v. Abbott Labs, 512 F. Supp. 1031, 1035 (D. Mass. 1981)).  "Unlawful intent comprises two distinct mental states: knowledge that the other's conduct is tortious, and

an intent to substantially assist or encourage that conduct."  Id. (footnote omitted).  JPMorgan

argues that Count I must be dismissed because the plaintiffs have not met either of these

elements.  This court finds that the Mansors' allegations are sufficient to show that Williams

was acting with an unlawful intent when she took steps to lift the restraints on the Millennium

accounts.

<u>**Williams' Alleged Knowledge of Fraudulent Conduct**</u>

The Mansors claim that during her employment with WaMu, Williams was able to

observe, on a daily basis, the activities that were carried out by Wise and his associates, and

that she acquired specific knowledge of their conduct, including specific knowledge that they

were stealing money from Millennium Bank investors.  (Compl. ¶¶ 18, 75).  In addition, the

plaintiffs have alleged various facts to support their claim that Williams acquired knowledge of

the unlawful activity.  For example, but without limitation, the plaintiffs have alleged that

Williams developed a close relationship with the Hoegels, and regularly assisted Wise and the

Hoegels with their banking activities.  (See id. ¶¶ 13, 15, 17, 19-23).  They have also alleged that

because Williams observed the actions of Wise and the Hoegels on a daily basis, she was able to

see them depositing numerous checks into the Millennium accounts, and submitting wire

requests for the transfer of funds from those same accounts to off-shore accounts held by

Wise, the Hoegels, and various members of their families.  (See id. ¶¶ 17-18).  In addition, the

plaintiffs have alleged that Williams acquired knowledge, based on notations written on the

face of the checks, of investor expectations that their funds would be used to purchase CDs at

certain specified interest rates, even though she could also see that no money was being used

for any legitimate banking or investment activity, and Wise had told her that he did not sell

28

securities or other investment products.  (See id. ¶¶ 14, 18).  This court finds that these

allegations are sufficient to support a strong inference, as required under Fed. R. Civ. P. 9(b),

that Williams had knowledge of the fraudulent activities carried out by the perpetrators of the

Millennium fraud at the time she was working for JPMorgan, and that the Bank was aware of

the fraudulent account activity.  See Benson, 2010 WL 1526394, at *3-4 (finding that plaintiffs

"pled a plausible claim that WaMu/JPMorgan knew of the Ponzi scheme allegedly perpetrated

by Mr. Wise and his associates" where plaintiffs alleged that Napa, California branches had a

close business relationship with Wise and his associates, senior bank employees oversaw and

helped effectuate various banking transactions executed by Ponzi scheme perpetrators, and

court could reasonably infer that senior employees in Napa branches had knowledge about the

nature of the Millennium accounts and account transactions).

The defendant's efforts to defeat this conclusion is unavailing.  To the extent JPMorgan

argues that Williams' knowledge cannot be imputed to the Bank because Williams was a

"branch-level" employee, its argument is insufficient to warrant a dismissal.  (See Def. Mem. at

17).  The question "[w]hether an individual's knowledge will be imputed to the [employer]

depends on a factual determination, according to the particular circumstances, of the

individual's position in the corporate hierarchy[.]"  United States ex rel. Vavra, 727 F.3d at 355

(Jolly, J., concurring) (quotations and citations omitted).  Accordingly, the Mansors should have

an opportunity to develop the factual record on this issue, and their aiding and abetting claim

will not be dismissed on this basis.

JPMorgan also insists that the plaintiffs "have not alleged anywhere near the factual

support necessary to create a 'strong inference'" that the Bank had knowledge of the

underlying fraud.  (Def. Mem. at 14).  In particular, JPMorgan contends that the Complaint lacks

facts regarding its awareness as to the "precise details" of Millennium's business, such as "the

precise nature of Millennium's representations to or agreements with its investors[,]" "the

ultimate disposition of the investor funds after they were transferred out of the Millennium

Accounts," or whether the plaintiffs' money "was still in the Millennium Accounts when the

Ponzi scheme was exposed."  (Id. at 14-15).  This court finds that no such details are necessary

to state a claim for relief.

    In support of its argument that the plaintiffs have failed to plead knowledge, JPMorgan

relies primarily upon the Supreme Judicial Court's ("SJC's") decision in Cahaly v. Benistar Prop.

Exch. Trust Co., Inc., 451 Mass. 343, 885 N.E.2d 800 (2008).  (See Def. Mem. at 13-15; Def. Reply

Mem. at 7-9).  In that case, the SJC determined that evidence presented at trial was insufficient

to support a reasonable inference that Merrill Lynch had actual knowledge of underlying

wrongdoing by Benistar Trust, and that the trial court appropriately granted judgment

notwithstanding the verdict to Merrill Lynch on claims for aiding and abetting Benistar Trust's

conversion and breach of fiduciary duty.  Thus, as the SJC concluded in relevant part:

> The indirect, circumstantial evidence amassed at trial may suggest that
> Merrill Lynch knew the nature of Benistar Trust's business.  But it does
> not erase the evidentiary lacunae between Merrill Lynch's knowledge of
> Benistar Trust's services and knowledge that Benistar Trust was violating
> its fiduciary agreements to clients and converting client funds by trading
> in the Benistar Trust corporate account.  Crucially, no evidence of Merrill
> Lynch's actual knowledge of Benistar's agreements with its clients was
> presented at trial.

Cahaly, 451 Mass. at 356-57, 885 N.E. 2d at 814.  JPMorgan argues, based on the SJC's

reasoning in Cahaly, that the Mansors' failure to allege facts describing the precise nature of

Millennium Bank's relationship with its customers is fatal to their aiding and abetting claim.

This court finds that JPMorgan's reliance on Cahaly is misplaced.  As an initial matter,

that case was decided after the plaintiffs had an opportunity to develop a full evidentiary

record and present evidence at trial.  It did not address the sufficiency of their complaint at the

pleading stage of the litigation.  Furthermore, the aiding and abetting claims asserted in that

case were different than the claims at issue here.  While Merrill Lynch's knowledge regarding

the substance of Benistar's agreements with its clients may have been crucial to the plaintiffs'

ability to establish liability against Merrill Lynch for aiding and abetting Benistar's conversion

and breach of fiduciary duty to its clients, the defendant has not shown why such knowledge is

critical in connection with this claim of aiding and abetting fraud.  For the reasons detailed

above, the plaintiffs in this case have alleged sufficient facts to support a strong inference that

JPMorgan was aware of the underlying fraud at the time the restraints on the Millennium

accounts were removed.

JPMorgan further contends that the plaintiffs' own pleadings defeat any inference of

knowledge on the part of the Bank.  (Def. Mem. at 15-16).  Thus, in their Complaint, the

plaintiffs allege as follows:

> Because Wise knew that bank fraud investigators would eventually ask
> questions, he developed a storyline that [his businesses] did not sell
> securities or other investment products, but were an intermediary for
> wealthy clients, who desired to invest without divulging their identity,
> much like a trust company.  This was the story that Wise, Jackie and Kristi
> passed to Tammy [Williams] and Bianca [Groves] and other WAMU staff.

(Compl. ¶ 14).  According to JPMorgan, this "allegation alone negates any conclusion that [the

Bank] was somehow 'in on' the scheme" to defraud investors  (Def. Mem. at 15).  This court

disagrees.  As detailed above, the plaintiffs claim that despite the alleged "storyline," Williams

was able to acquire specific knowledge of the alleged fraud through observations of the

perpetrators' day-to-day activities and her own involvement with the accounts.  (See Compl. ¶¶ 15, 17-18). Thus, for example, Williams was able to see that no money was used for any legitimate banking or other investment activity, and that Wise and his associates were transferring the money to their own offshore accounts.  (Id. ¶¶ 17-18).  Moreover, the plaintiffs have alleged that Williams made recommendations to Kristi Hoegel about ways to avoid continued scrutiny from bank investigators, and expressed a desire to help the perpetrators "so you won't get caught[,]" and that after JPMorgan's acquisition of WaMu, Williams expressed concerns about all of them "getting caught."  (Id. ¶¶ 20, 30).  These alleged facts support a strong inference that Williams knew of the fraudulent account activity, notwithstanding the perpetrators' effort to mislead her about the nature of their business, and that she decided to assist them anyway.

JPMorgan reasons that because the plaintiffs were not parties to conversations between Williams and Kristi Hoegel, their allegations concerning Williams' statements, such as her comments about "getting caught," must have been made on information and belief.  (Def. Mem. at 11).  It further contends that "allegations made on information and belief are wholly insufficient to satisfy Rule 9(b), and a court must disregard them unless the complaint 'set[s] forth the source of the information and the reasons for the belief.'"  (Id. (quoting Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991)).  There is no dispute that the Mansors did not include such information in their Complaint.  Accordingly, JPMorgan urges this court to disregard Williams' alleged statements, as well as all allegations regarding communications between Williams and the perpetrators of the Millennium Bank fraud.  (See id. at 12).

This court declines to disregard any of the challenged allegations.  Although this case has not advanced beyond the pleading stage,[7] it has been pending for a long time, and counsel for the plaintiffs has engaged in an extensive investigation of the facts underlying his clients' claims.  Therefore, this is not a situation in which the only reasonable conclusion is that the allegations at issue were made upon information and belief.  Compare In re Agape Litig., 773 F. Supp. 2d at 316 (finding it difficult to see how plaintiffs' allegations could not be made upon information and belief where plaintiffs were not present for alleged conversations, and "it is unclear on what basis the Plaintiffs . . . are aware of the substance of these conversations").  Indeed, counsel for the plaintiffs has signed the Complaint "under the pains and penalties of perjury[,]" in an effort to verify the facts alleged therein.  (See Compl. at 34).  Under the circumstances, this court finds it appropriate to accept the plaintiffs' allegations regarding the substance of Williams' alleged statements and conversations with the Kristi Hoegel.[8]  The defendant's motion to dismiss the aiding and abetting claim on these grounds is denied.

### Intent to Substantially Assist or Encourage Fraud

In order to plead an unlawful intent on the part of JPMorgan, the plaintiffs must allege "an intent [by the defendant] to substantially assist or encourage" the underlying fraud.  Taylor, 576 F.3d at 35.  This requires the Mansors to plead facts showing that JPMorgan shared the objective of Wise and the Hoegels to defraud and convert the funds of Millennium investors.

---

[7]  While the case remains at the pleading stage, it has been heavily litigated.  In particular, the parties have engaged in a lengthy and hard fought dispute regarding the scope of the BSA privilege, and its application to the circumstances of this case.

[8]  This court also notes that this is not a securities fraud case, such as the Romani case relied on by JPMorgan, in which context the First Circuit has been "especially rigorous" in demanding factual support for allegations of fraud, and has therefore been especially wary of claims made on information and belief.  See Romani, 929 F.2d at 878.

See id. at 35 n.21 (because "Massachusetts aiding and abetting liability generally requires that a defendant share the mental state of the principal violator," conspiring defendants had to share the principal violator's alleged objective to defraud its employees).  This court finds that the plaintiffs have pled sufficient facts to satisfy this requirement.  By repeatedly taking steps to remove the restraints placed on the Millennium accounts in October 2008, January 2009 and February 2009, notwithstanding her alleged knowledge of the fraudulent scheme and concerns about "getting caught," Williams manifested an intent to assist Wise and the Hoegels in defrauding the Millennium Bank investors.

Whether Williams' alleged intent may be imputed to the Bank is a matter that must be resolved at a later stage in the litigation.  As described above, the question whether Williams was in a position to act on behalf of her new employer must be evaluated, following further development of the factual record, in light of the particular circumstances surrounding her position and level of authority.  Similarly, this court finds that it would be premature to try to resolve JPMorgan's argument that "the practical circumstances surrounding [the Bank's] acquisition of WaMu's banking assets prevents the Court from imputing to [JPMorgan] the knowledge or intent held by former WaMu branch personnel immediately upon the acquisition."  (Def. Reply Mem. at 10).  This argument raises questions, not only about Williams' position in the post-acquisition hierarchy of JPMorgan, but also about the circumstances surrounding the acquisition.  Accordingly, JPMorgan's motion to dismiss is denied with respect to the Mansors' claim for aiding and abetting common law fraud.

D.     **Count II: Claim for Negligence with Knowledge of Fiduciary Relationship**

In Count II of their Complaint, the Mansors are seeking to hold JPMorgan liable, under Massachusetts law, for negligence with knowledge of fiduciary relationship.  More specifically, the Mansors claim that beginning on September 25, 2008, the date of the WaMu acquisition, JPMorgan had knowledge that Wise and the Hoegels had a fiduciary relationship with the Millennium Bank customers, and that Wise and his associates were engaged in an ongoing scheme to defraud those customers out of millions of dollars.  (Compl. ¶¶ 80-81).  They further claim that JPMorgan breached its own duty of care to those investors by failing to take steps to prevent the continued diversion of funds, and that its inaction caused the plaintiffs and the putative class members to suffer ongoing losses.  (See id. ¶¶ 82-84).  For the reasons that follow, this court finds that the plaintiffs have failed to allege a plausible claim of negligence against JPMorgan because they have not established that the Bank owed a duty of care to the plaintiffs.

"To make out a claim for negligence, the plaintiff must show that the defendant 'owed him a duty of reasonable care, that the [defendant] committed a breach of that duty, that damage resulted, and that there was a causal relation between the breach of duty and the damage.'"  Go-Best Assets Ltd. v. Citizens Bank of Mass., 463 Mass. 50, 54, 972 N.E.2d 426, 431 (2012) (quoting Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 39, 907 N.E.2d 213 (2009)).  The issue raised by JPMorgan in its motion to dismiss Count II is whether JPMorgan owed the Mansors a duty of reasonable care.  (See Def. Mem. at 18).  This court finds that the Complaint fails to establish such a duty, and that Count II must be dismissed on this basis.

"[A] bank generally has no duty to monitor the activities of authorized account-holders and prevent misappropriation." Bernkopf Goodman LLP v. Hebert, Civil Action No. 11-11495-RWZ, 2013 WL 803521, at *2 (D. Mass. Mar. 5, 2013) (citing Go-Best Assets Ltd., 463 Mass. at 54, 972 N.E.2d at 431).  As both of the parties recognize, however, there is a limited exception to this rule:

> a bank may be held liable for its customer's misappropriation where (1) there is a fiduciary relationship between the customer and the non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has actual knowledge or notice that a diversion is to occur or is ongoing.

Chaney v. Dreyfus Serv. Corp., 595 F.3d 219, 232 (5th Cir. 2010) (quotations and citation omitted).  See also Fine v. Sovereign Bank, Civil Action No. 06cv11450-NG, 2011 WL 2134380, at *6 (D. Mass. May 27, 2011) (explaining that banks have "a duty to investigate signs of fraud . . . in a fiduciary account").  This court finds that the Mansors have failed to allege any facts showing the existence of a fiduciary relationship between the perpetrators of the Millennium Bank scheme and their investors, or that JPMorgan ought to have been aware of any such relationship.

"Generally, a fiduciary relationship exists where 'a party reposed confidence in another and reasonably relied on the other's superior expertise and knowledge.'" Chaney, 595 F.3d at 232 (quoting Wiener v. Lazard Freres & Co., 241 A.D.2d 114, 672 N.Y.S.2d 8, 14 (N.Y. App. Div. 1998)).  However, a business relationship "does not become a general fiduciary relationship merely because an uninformed customer reposes trust in [another.]" Patsos v. First Albany Corp., 433 Mass. 323, 335, 741 N.E.2d 841, 851 (2001).  In order to determine whether a fiduciary relationship exists under Massachusetts law, "courts typically look to the degree of

36

discretion a customer entrusts" to the other party.  Id. at 333, 741 N.E.2d at 849.  "Where the account is 'non-discretionary,' meaning that the customer makes the investment decisions and the [other party] merely receives and executes the customer's orders, the relationship generally does not give rise to general fiduciary duties."  Id.  On the other hand, "where the account is 'discretionary,' meaning that the customer entrusts the [other party] to select and execute most if not all of the transactions without necessarily obtaining prior approval for each transaction, the [other party] assumes broad fiduciary obligations[.]"  Id. at 333, 741 N.E.2d at 850.

The Complaint sets forth no facts that would support the existence of a fiduciary relationship between Millennium Bank and its customers.  In particular, there are no facts describing the nature of the relationship between Wise and the plaintiffs or suggesting that the Millennium investors entrusted Wise and the Hoegels with discretion to select their investments.  Nor are there any facts indicating that Wise and the Hoegels even offered investment advice to their customers.  On the contrary, the plaintiffs allege that "[t]he memo lines on the [customers'] checks typically included references to 'CD' and interest rates ranging from 6.75% to 10%."  (Compl. ¶ 39).  Thus, the Complaint indicates that the Millennium Bank customers retained full control over the nature of their intended investments.

The plaintiffs allege, as part of their negligence claim, that

> JPMorgan had actual knowledge that its customers, Wise and the Hoegels, had a fiduciary relationship with customer/clients, who believed that they were acquiring CDs, based on numerous memos contained on checks being deposited at the bank.  JPMorgan also knew that investor funds included IRA and other retirement funds held in trust pursuant to federal law.

(Compl. ¶ 80).  However, such conclusory allegations are insufficient to support a plausible

claim that a fiduciary relationship existed and that JPMorgan owed the plaintiffs a duty of care.

See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)

("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to state a plausible claim for relief).  There are no facts indicating

that Wise and the Hoegels purported to handle their clients' retirement funds, or that

JPMorgan was aware of such information.  Moreover, the plaintiffs' characterization of the

relationship as "fiduciary" is inconsistent with their description of the investments as CDs

bearing certain interest rates specified by Millennium's clients.  Those facts suggest that the

investments were intended to be non-discretionary, and that no fiduciary relationship existed.

Even if the Mansors had alleged the existence of a fiduciary relationship between

Millennium Bank and its customers, the Complaint would still be inadequate to establish a duty

of reasonable care on the part of JPMorgan because the plaintiffs have failed to plead facts

showing that JPMorgan knew or ought to have known that Wise and his associates were acting

in a fiduciary capacity.  According to the plaintiffs, Wise told Williams, Groves and other

individuals who were working at WaMu prior to JPMorgan's acquisition that he did not sell

securities or other investment products, but was merely "an intermediary" for wealthy

individuals.  (Compl. ¶ 14).  To the extent any of those employees believed Wise's statements,

there is nothing that would have suggested to them that he was acting in a fiduciary capacity.

The plaintiffs also claim that Williams, and later members of JPMorgan's AML Ops Unit, learned

that the Millennium investors believed they were purchasing CDs at specified interest rates.  As

discussed above, however, that information would not have alerted the Bank to the existence

of a fiduciary relationship because it would not have indicated that Wise had been given

discretion to select customer investments.[9]  Finally, while JPMorgan may have known that Wise

was disregarding his clients' instructions to invest their funds in CDs, and was diverting those

funds for personal gain, any such knowledge would not have alerted the Bank to the nature of

the relationship between Millennium Bank and its customers, or suggested that Wise and his

associates were acting in a fiduciary capacity at the time they engaged in the unlawful account

activity.  See Vogelaar v. H.L. Robbins & Co., 348 Mass. 787, 788, 204 N.E. 2d 461, 462 (1965)

(finding that allegations were insufficient to plead the existence of a fiduciary relationship

between defendants and decedent where plaintiff failed to include facts describing the nature

and scope of defendants' obligations to decedent and whether defendants were required to

direct investment program without control by decedent).  For this reason as well, the plaintiffs

have not alleged the existence of a duty on the part of JPMorgan to make inquiries and guard

against the misappropriation of client funds by Wise and the Hoegels.  Accordingly, JPMorgan's

motion to dismiss Count II is allowed.

---

[9]  The plaintiffs claim that "[a]s of October 8, 2008, JPMorgan had knowledge that Wise and Kristi [Hoegel] had opened Business Corp/Joint Venture[ ] accounts at a WAMU branch in Las Vegas, Nevada in the names of UT of S, LLC ('UT of S') and Sterling, IS, LLC ('Sterling')."  (Compl. ¶ 51).  That allegation too is insufficient to support an inference that JPMorgan knew or ought to have known that Wise and the Hoegels were acting as fiduciaries for their customers.  The designation of those accounts as "Business" or "Joint Venture" accounts does not suggest that Wise and the Hoegels had discretionary authority to invest funds on behalf of their clients or that they were otherwise obligated to safeguard funds for their clients.  Compare Lerner, 459 F.3d at 289 (finding that bank had duty to make reasonable inquiries and safeguard funds from misappropriation where plaintiffs alleged that "banks had actual knowledge that the accounts were intended to be trust accounts for client funds").  Accordingly, JPMorgan had no reason to suspect that Wise and the Hoegels were diverting funds from fiduciary accounts.

E.     **Defendant's Request to Limit the Scope of the Proposed Class**

The Bank has moved, as an alternative to dismissal, that the court enter an order

limiting the scope of the potential class, which the plaintiffs have defined in their Complaint as

follows:

> All persons or entities in the United States who, between September 25,
> 2008 and March 25, 2009 purchased or otherwise acquired a purported
> Certificate of Deposit from or through Millennium, UTS, and/or one of
> the LLCs[.]

(Compl. ¶ 57).  JPMorgan requests that this court limit the proposed class "to those investors

(1) who were actually defrauded by Millennium Bank, and (2) whose funds were deposited with

[JPMorgan] (as opposed to some other bank) between October 8, 2008 and February 26, 2009

and whose injuries were caused by [JPMorgan]."  (Def. Mot. at 1-2 (footnote omitted)).  This

court finds that the Bank's request is premature.

This court agrees that the proposed class appears far too broad because it potentially

encompasses individuals who recovered their investments and/or whose losses were unrelated

to JPMorgan's conduct.  Nevertheless, the plaintiffs have reserved the right to modify the

description of the class, as well as the proposed class period, based on the results of discovery,

and this court is not prepared to define the class at this stage, based only on allegations set

forth in the Complaint.  Therefore, the defendant's request to amend the scope of the alleged

class is denied without prejudice to renewal at a later point in the litigation.

## IV.   CONCLUSION

For all the reasons detailed herein, the "Defendant's Motion to Dismiss Second

Amended Complaint and Motion to Strike" (Docket No. 345) is ALLOWED IN PART and DENIED

IN PART.  The plaintiffs' claim for negligence shall be dismissed, but the motion is otherwise

denied.  However, nothing herein shall preclude JPMorgan from challenging the scope of the proposed class again at a later stage in the proceedings.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge