**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Civil Action No. 1:12-cv-10544-JGD**

EDMUND J. MANSOR, and
ROBERTA M. MANSOR,

        Plaintiffs,

v.

JPMORGAN CHASE BANK, N.A.,

        Defendant.

_____/

**CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES,
EXPENSES, AND CLASS REPRESENTATIVE SERVICE AWARDS
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

## INTRODUCTION

The settlement negotiated by Class Counsel ends more than six years of hard-fought litigation of claims against JPMorgan Chase Bank, N.A. ("Chase") for assistance it provided to the Millennium Ponzi scheme. Class Counsel Keith L. Miller, a sole practitioner, began to investigate claims against Chase more than nine years ago.  Since that time, Miller has interviewed hundreds of witnesses, drafted the initial and amended pleadings, reviewed more than 174,000 pages of documents, briefed numerous motions, handled a First Circuit interlocutory appeal, and engaged in considerable written and testimonial discovery.[1] Attorneys from Kozyak Tropin & Throckmorton LLP ("KTT") joined Mr. Miller in his efforts in November 2016, and since that time have spent more than 2,500 hours briefing and arguing critical motions, including Plaintiffs' motion for class certification, conducting and defending depositions, meeting with experts, and negotiating the terms of the Settlement, among other things.

All told, Class Counsel dedicated 5,237.6 hours of their time over the course of six years to the pursuit of Plaintiffs' and absent class members' claims on a contingency basis, with no guarantee that they would receive any compensation for their considerable time and effort.  Indeed, Class Counsel undertook significant risk in pursuing these claims—a California district court dismissed a prior class action against Chase with similar claims in 2012, and that dismissal was affirmed on appeal; Chase raised significant defenses on class certification, including the potential application of the Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. 1773 (2017); and Chase still would have had opportunities to dispose of the class claims on summary judgment and at trial. Still, Mr. Miller and KTT dedicated

---

[1] The time and costs attached to Mr. Miller's pre-litigation investigation are <u>not</u> included in the hours, fees, or expenses submitted to the Court in connection with this motion, but are estimated to be in excess of 2,000 hours.

$2,393,912.50 of their billable time to this case and spent $163,242.82 on research, travel, court reporters, couriers, photocopies, and other standard expenses.  Despite these expenditures, they ask the Court to award them just $1,618,750 in fees and expenses, which would cover approximately 63% of their total costs. Such an award falls squarely within the First Circuit's benchmark in percentage-of-the-fund cases.

Class Counsel also seek a $25,000 service award for Class Representatives Edmund and Roberta Mansor, who served as plaintiffs in this case for more than six years, aided in the investigation of the claims against Chase, provided written and documentary discovery, sat for deposition, and exposed themselves to liability for Chase's fees and costs. This action could not have been litigated to a successful settlement without their substantial assistance.

## FACTUAL BACKGROUND

This case arises from William Wise's $150 million Millennium Bank Ponzi scheme, which involved the sale of bogus CDs with exorbitant interest rates.  *See* SAC ¶¶ 8-10.  Wise and his co-conspirators, Jackie and Kristi Hoegel, used accounts at two WaMu, and later Chase, to steal millions of dollars that they had collected from investors.  *See id.* ¶¶ 12, 15-17.  Plaintiffs in this action brought claims against Chase for aiding and abetting the Millennium fraud.

Plaintiffs alleged that Chase employees, and particularly branch manager Tamara Ressler, had facilitated the Millennium scheme. Ressler acquired specific knowledge of Wise's illegal activities while working at WaMu and willingly assisted the Millennium Bank fraud anyway.  *See id.* ¶¶ 13-32.  Plaintiffs alleged, *inter alia*, that Ressler observed a high volume of checks being deposited into the Millennium accounts, including memos describing the terms and interest rates of the Millennium CDs, SAC ¶¶ 18, 19; observed that Wise and the Hoegels were not placing any money in legitimate enterprises, *id.* ¶ 18; received calls from investigators regarding the nature of

2

the Millennium business and Wise, *id.* ¶ 19, 22; established a remote wiring interface to reduce Millennium's visibility at branch offices, *id.* ¶ 18, 21; and assisted Wise and the Hoegels in having restraints removed from personal and Millennium accounts, *id.* ¶¶ 26, 27, 30, 31, 47.

Plaintiffs alleged that Ressler continued to assist the Millennium fraud after September 25, 2008, when the United States Office of Thrift Supervision placed WaMu into receivership with the FDIC, and sold certain of WaMu's assets to Chase. *See, e.g., id.* ¶ 28, 30-32, 39. Those assets included the Millennium Bank accounts, as well as the two Napa branches where Wise and the Hoegels had been executing their fraud.   SAC ¶ 28.   Accordingly, all of the Napa branch employees, including Ressler, became employees of Chase.  *Id.* ¶ 29.

The SEC filed a civil enforcement action against Wise and his associates on March 25, 2009 in the United States District Court for the Northern District of Texas.  *Id.* ¶ 35.  By that time, Millennium Bank investors had lost millions of dollars.  *See id.*  ¶ 49.

### B.     The Litigation

In early 2009, after being contacted by one of the Millennium victims who resided in Massachusetts, Keith L. Miller began investigating potential claims against third parties arising from the Millennium fraud.   *See* Declaration of Keith L. Miller ("Miller Decl."), attached as **Exhibit A**, ¶ 10.  During his pre-litigation investigation, Miller reviewed discovery and pleadings from the SEC docket, had contact with the SEC lead attorney, Jennifer Brandt, and the court-appointed Receiver, Richard Roper, and interviewed more than two hundred witnesses, including hundreds of Millennium victims, William Wise, Jackie and Christie Hoegel, their attorneys, and other employees and associates of Wise. *See id.*  Miller then entered into limited representation agreements with more than 140 Millennium investors for purposes of investigating the potential claims.  *See id.*  He also prepared and solicited responses to questionnaires from each of these

investors, from which he assembled an extensive Excel database, which proved invaluable when it was necessary to file the Massachusetts action in March 2012. *See id.*

Before filing this action, Miller had caused an action to be filed in the United States District Court for the Northern District of California, together with local California counsel, captioned *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 MEJ. *See id.* ¶ 11. *Benson* survived Chase's initial motion to dismiss, but was ultimately dismissed on a second, claiming pre-emption under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1821(13)(D)(ii), as the result of the failure of Washington Mutual Bank ("WaMu"). *See id.*

Miller, with local counsel, appealed that dismissal to the Ninth Circuit Court of Appeals, where oral arguments were heard, after which the Ninth Circuit affirmed the dismissal in March 2012. *See Benson v. JP Morgan Chase Bank N.A.*, 673 F.3d 1207 (2012). *See id.* ¶ 12. The Ninth Circuit, however, indicated its belief that there might still be valid and distinct claims against JP Morgan as the result of conduct taking place after the acquisition of WaMu from the FDIC. *See id.* That decision came down only one week before the three-year statute of limitations was going to run on most claims arising from the alleged conduct of JP Morgan. *See id.*

As the result of the database he had prepared, Miller was able to quickly determine where there were Millennium victims who had invested after the acquisition and was therefore in a position to prepare and file a new complaint in Massachusetts only two days before the statute of limitations expired. *See id.* ¶ 13. Miller filed the original complaint in this action against Chase on March 23, 2012. [D.E. 1.] Chase moved to dismiss the original complaint on October 1, 2012 [D.E. 18, 19.] Shortly thereafter, the parties engaged in months of motion practice and argument on privilege issues raised by Chase after Miller was provided documents by the court-appointed Receiver in the SEC action, which included information governed by the Bank Secrecy Act

("BSA"). Ultimately, Chase withdrew its motion to dismiss, and the Court granted Plaintiffs leave to file an amended complaint.  [D.E. 31, 32.]

After the Court denied a motion by Chase to certify certain BSA issues to the First Circuit Court of Appeals, Chase sought mandamus relief from that Court on those issues, and was granted leave to file briefs on its Petition in April 2014.  Following full briefing on the BSA issues, the First Circuit heard argument in June 2015, and later denied the Chase Petition.  *See In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36 (1st Cir. 2015).

Plaintiffs filed their First Amended Complaint on January 24, 2014. [D.E. 203.] Chase moved to dismiss, and pursuant to a Court scheduling order, its motion was fully briefed by April 18, 2014. [D.E. 210-214, 227, 244, 253.]  The Court heard argument on Chase's motion on May 20, 2014 [D.E. 270], and months of discovery and discovery motions followed.

The Court granted Chase's motion to dismiss on December 10, 2014, holding that under FIRREA, it lacked jurisdiction to consider any claim based on WaMu's actions before it was placed into receivership by the FDIC, which included all claims raised by Plaintiffs Geoffrey and Sharon Hollis.  [D.E. 328.]  The Court also dismissed the remaining claims without prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  [*Id.*]  The Court granted Plaintiffs leave to file a Second Amended Complaint. [*Id.* at 34-35.]

On December 12, 2012, in response to an emergency motion by Chase, the Court stayed further discovery and case management deadlines.[2]  [D.E. 331, 333.]  The Mansors filed their Second Amended Complaint under seal on March 13, 2015 [D.E. 340], which Chase moved to dismiss one month later [D.E. 346].  On April 26, 2016, the Court denied Chase's motion to dismiss

---

[2] Discovery was stayed by the Court for over sixteen months (12/12/14 to 4/26/16) pending a ruling on the motion to dismiss. [D.E. 342].

with respect to all claims save Plaintiffs' claim for negligence against Chase. [D.E. 364.]  Chase answered the Second Amended Complaint on June 3, 2016.  [D.E. 369, 374.]

KTT appeared for Plaintiffs on November 21, 2016, and Plaintiffs filed a motion to amend the complaint further on December 12, 2016.  [D.E. 398.]  Chase opposed that motion and the Court denied it after a hearing on September 18, 2017.

Plaintiffs moved for class certification in the beginning of January 2018.  In connection with its opposition to the class certification motion, Chase also moved to strike one of Plaintiffs' experts, as well as portions of its motion.  Both motions were filed under seal and were fully briefed and remained pending when the parties met to mediate Plaintiffs' claims.

The parties mediated Plaintiffs' claims before former Massachusetts Superior Court Judge Margaret R. Hinkle on March 6, 2018, and agreed to the material terms of a settlement.  The parties continued to negotiate and draft a memorandum of understanding and settlement agreement, and executed the Settlement Agreement on June 18, 2018, two months after mediation had begun.

Plaintiffs moved for preliminary approval of the settlement, notice, and notice plan, and for certification of a settlement class on June 21, 2018.  [D.E. 525.]  The Court allowed the motion and entered an order granting preliminary approval on June 22, 2018, and also appointed KTT and Miller as Settlement Class Counsel.  [D.E. 527, 528.]  Class Counsel now move for an award of fees and expenses equal to 35% of the Settlement Fund, and just 63% of their lodestar.

## LEGAL ARGUMENT

### I.    THE COURT SHOULD AWARD CLASS COUNSEL REASONABLE FEES AND COSTS.

For their extensive work prior to the filing of the complaint and throughout the pre-trial and settlement phases of this litigation, Class Counsel seek $1,618,750 in attorneys' fees and costs, equaling 35% of the monetary settlement benefits provided to the Class, and 63.3% of their actual

lodestar (or an 0.63 multiplier).

## A. A FEE AND EXPENSE AWARD AMOUNTING TO 35% OF THE SETTLEMENT FUND WOULD REASONABLY COMPENSATE COUNSEL.

Federal courts recognize that when the parties to a class action negotiate a settlement that results in the creation of a settlement fund to benefit the class, the costs of the litigation, including reasonable attorneys' fees, should be recovered from that fund. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole[.]"). In the First Circuit, "the 'prevailing praxis' for fee determinations is the 'percentage of fund' approach," but a court may also consider a "lodestar cross check," by multiplying the number of hours reasonably spent on the litigation by counsel's reasonable hourly rates, to assess the reasonableness of a percentage of the fund award. *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-cv-11280, 2017 WL 5177610, at *4 (D. Mass. Nov. 8, 2017) (citing *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995); *In re Lupron Mktg. & Sales Practices Litig.*, No. 01-cv-10861, 2005 WL 2006833, at *6 (D. Mass. Aug. 17, 2005)); *Roberts v. TJX Cos., Inc.*, No. 13-CV-13142-ADB, 2016 WL 8677312, at *9 (D. Mass. Sept. 30, 2016). "Although the First Circuit has not set a presumptive benchmark for percentage of fund awards, other courts in the Circuit have noted that such benchmark has been between twenty to thirty-five percent." *Id.* (citing *Mazola v. May Dept. Stores Co.*, No. 97-cv-10872-NG, 1999 WL 1261312, at *4 (D. Mass. January 27, 1999); *In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 172 (D. Mass. 2014)). "Regardless of the calculation method employed, the touchstone of the inquiry is reasonableness." *Bezdek v. Vibram USA, Inc.*, 79 F. Supp. 3d 324, 350 (D. Mass. 2015) (citation omitted).

The First Circuit has not set forth a definitive list of factors to consider when determining

the reasonableness of a percentage of the fund fee award, but district courts in the Circuit have considered (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; (7) the awards in similar cases; and (8) public policy considerations. *Roberts*, 2016 WL 8677312, at *10 (citing *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005)); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 266 (D.N.H. 2007); *Lupron*, 2005 WL 2006833, at *3.   As explained below, application of these factors here supports the full requested award.

### 1.   The Size of the Fund and the Number of Persons Benefitted

Class Counsel secured $4.625 million in monetary relief for the fewer than two hundred investors who purchased or otherwise acquired CDs from the promoters of the Millennium Ponzi scheme between September 25, 2008 and March 9, 2009. This result is extraordinary, and perhaps best establishes the propriety of the requested fee award. *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) (a "critical factor is the degree of success obtained").

Once attorneys' fees and expenses, the Receiver's fee, and the class representatives' incentive awards have been accounted for, almost $3 million will remain for distribution to fewer than two hundred class members.   *See* Declaration of Tal J. Lifshitz ("Lifshitz Decl."), attached as **Exhibit B**, ¶ 17.   Class members who remain in the class will collect their pro rata share of the fund based on the amount invested, and any evaluation of the benefits of settlement must be tempered by the recognition that any compromise involves concessions by all settling parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an

abandoning of highest hopes.'" *Officers for Civil Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted). Though the Settlement will not make the class members whole, it will compensate a significant percentage of their losses and eradicate the risks that they faced in continuing with litigation, such as denial of class certification, the striking of the class's experts' opinions, summary judgment, and a reduced judgment or total loss at trial, as well as the costs attached to moving forward with litigation. *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005) ("As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication."). The proposed settlement saves Plaintiffs and the proposed class from facing these significant obstacles, and eliminates the significant risk that they would recover nothing at all after several more years of litigation.

### 2. The Skill, Experience, and Efficiency of Class Counsel

This litigation required a high degree of skill and experience given the complexity of the issues. As detailed in the preliminary approval motion [D.E. 525], Plaintiffs' Counsel have considerable experience litigating class actions and other complex civil cases, including cases involving sophisticated Ponzi schemes. KTT has extensive class action experience, and has successfully litigated dozens of consumer and investor class actions to settlement approval over the past fifteen years.[3] *See, e.g., Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *LiPuma v. Am. Express Co.*, No. 04-cv-20314 (S.D. Fla.); *Bruhl v. Price WaterhouseCoopers Int'l*, No. 03-23044 (S.D. Fla.). Most recently, attorneys at KTT, including undersigned counsel, led a team representing investors in the Jay Peak Ponzi scheme in a suit against the scheme's architects and the financial institutions that assisted them. *See Daccache v. Raymond James Fin., Inc.*, No.

---

[3] The bios of the KTT attorneys staffed on this litigation are attached to the Lifshitz Declaration as Exhibit 4. Keith L. Miller's bio is attached to his declaration as Exhibit 3.

16-cv-21575 (S.D. Fla.).  KTT also represented investors in the largest Ponzi Scheme in Florida history, masterminded by local attorney Scott Rothstein. *See Razorback Funding, LLC v. Rothstein*, No. 09-62943 (Fla. Cir. Ct. – 17th Jud. Cir.).

Plaintiffs' Counsel Keith L. Miller is a Boston attorney with more than thirty years of experience in complex litigation, including business and construction disputes, commercial real estate, insurance coverage, defective products, and malpractice claims. He also represents SEC-appointed receivers with respect to claims arising from fraud, and for aiding and abetting fraud.

Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in the results they have achieved. They resolved this dispute efficiently despite the potential hurdles presented them and the arguments raised by Chase. The quality of Class Counsel and their achievement in this case is equally shown by the strength of their adversary, Foley & Lardner LLP, one of the finest defense firms in the country. *See* Lifshitz Decl. ¶ 13.  This factor thus also favors awarding the requested fee.

### 3.  The Complexity and Duration of the Litigation

Class Counsel Miller began to investigate the claims ultimately raised against Chase in early 2009, and filed the original complaint more than six years ago, in March 2012.  *See* Miller Declaration ¶ 10.  Over the course of six years, the parties litigated highly disputed issues arising from William Wise's $150 million Millennium Bank fraud, which involved innumerable complex transactions involving three different entities, and multiple accounts at WaMu, and then Chase. *See* SAC.  Demonstrating Chase's potential liability required knowledge and analysis of federal banking regulations, as well as Chase's own policies, and gathering and examining evidence to support the conclusion that Chase, through its employees, had actual knowledge of wrongful conduct—a heavy burden of proof that requires more than circumstantial evidence of the aider and

abettor's state of mind.  *See de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 323 (S.D.N.Y. 2011) (citations omitted) ("The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one."); *see, e.g., In re Canopy Fin., Inc.*, No. 12-CV-04646, 2015 WL 3505010, at *7 (N.D. Ill. June 2, 2015) ("[A]nalysis of claims of aiding and abetting fraud and breach of fiduciary duty has consistently distinguished actual knowledge and participation from the 'should have known' state of mind, and has just as consistently held that the latter mindset is not actionable."); *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1246 (M.D. Fla. 2013) ("Cases addressing the liability of banks for Ponzi schemes consistently hold that 'red flags' arising from suspicious activity giving rise to the presumption that the bank *should have known* about the Ponzi scheme are insufficient to allege aiding-and-abetting liability.").

Plaintiffs and Class Counsel were also faced with jurisdictional challenges under FIRREA, the same challenges that had defeated a parallel class action litigated against Chase in California. *See Benson v. JPMorgan Chase Bank, N.A.*, 673 F.3d 1207, 1217 (9th Cir. 2012).  Chase's FIRREA defense had already significantly narrowed the putative class, and continues to limit the class claims to transactions after the WaMu acquisition, and knowledge acquired and assistance provided by a limited subset of Chase employees.  [D.E. 328.]

Finally, Plaintiffs and the Class still faced significant obstacles to a judgment in their favor. Their motion for class certification remained pending, and Plaintiffs faced possibilities that a class would not be certified, or would be severely limited pursuant to the Supreme Court's holding in *Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. 1773 (2017), which some district courts have interpreted to deprive district courts of personal jurisdiction over claims against defendants who do not reside in the court's forum, *see* Plaintiffs' Reply in Support of Their Motion

11

for Class Certification (filed under seal on Feb. 20, 2018) ("Class Certification Reply"), at 3-6;[4] the Court would strike portions of their experts' testimony, making it more difficult for Plaintiffs to prevail at class certification and beyond; and the Court or a jury might have disposed of the case on summary judgment or at trial.

The duration and complexity of this action, and the inherent risks posed by continuing to litigate, weigh strongly in favor of the requested fee award.

### 4. The Risk of Nonpayment

A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are considerable. Indeed, "[m]any cases recognize that the risk assumed by an attorney is 'perhaps the foremost' factor' in determining an appropriate fee award." *Lupron*, 2005 WL 2006833, at *4. As the Ninth Circuit once explained:

> [C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases." ... This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases. ... In common fund cases, "attorneys whose compensation depends on their winning the case[ ] must make up in compensation in the cases they win for the lack of compensation in the cases they lose."

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (internal citations omitted); *see also, e.g., Detroit v Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) ("No one expects a lawyer whose compensation is contingent on his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor,

---

[4] In *Bristol-Myers*, the Court held that a California state court lacked jurisdiction over nonresident plaintiffs' claims in a mass tort action based on injuries suffered in each plaintiff's home state. *See* 137 S. Ct. at 1781-82. Some district courts have applied the decision to bar claims by nonresident class members in a class action, and Chase argued on class certification that *Bristol-Myers* would narrow the class definition here, limiting membership in the class to investors who are residents of Massachusetts, where the Court sits. *See* Class Certification Reply at 3, 5 n.3.

particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.") (citing *Cherner v. Transitron Elec. Corp.*, 221 F. Supp. 55, 61 (D. Mass. 1963)).[5]

It is for this reason that courts have applied a lodestar multiplier in common fund cases: "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing." *Lupron*, 2005 WL 2006833, at *4 (quoting *Behrens v. Wometco Enter., Inc.,* 118 F.R.D. 534, 548 (S.D. Fla.1988)); *see also Gordan v. Mass. Mut. Life Ins. Co.*, No. 13-CV-30184-MAP, 2016 WL 11272044, at *3 (D. Mass. Nov. 3, 2016) ("In cases where there is high risk and the likelihood of receiving no little or no recovery is a distinct possibility, it is common for a court to apply a multiplier to compensate the attorneys for the risk of nonpayment," including in cases where parallel actions have been dismissed).

These factors weigh in favor of awarding Class Counsel 35% of the total settlement recovery, inclusive of expenses, which amounts to only 63.3% of their actual lodestar. Class Counsel received no compensation during the course of this litigation and incurred substantial expenses litigating on behalf of the Class, which they risked losing had Defendants prevailed. *See* Lifshitz Decl. ¶ 23; Miller Decl. ¶ 22. Class Counsel Miller began investigating the claims against Chase in early 2009, and since that time, there has existed a real possibility that he and his co-counsel would recover nothing for Plaintiffs and the Class, and hence no compensation. *See* Miller

---

[5] *See also, e.g., Hall v. Best Buy Co*., 274 F.R.D. 154, 173 (E.D. Pa. 2011) (awarding 33% of monetary relief to class and "not[ing] that while this case has been pending, Class Counsel have not received any payment, and, by proceeding on a contingent-fee basis, ran substantial risk of nonpayment"); *In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13627, at *44 (C.D. Cal. 2005) ("The risk assumed by Class Counsel, particularly the risk of non-payment or reimbursement of expenses, is a factor in determining counsel's proper fee award.").

Decl. ¶ 10.  Class Counsel's investment of time and expenses has always been at risk and wholly contingent on the result they achieved.  The financial risks borne by Class Counsel over the course of more than six years fully support the fee requested.

### 5.  The Amount of Time Counsel Devoted to the Case

Prosecuting and settling the claims in this case demanded considerable time and labor. Both KTT and Keith Miller served as lead counsel. Mr. Miller devoted in excess of 2,000 hours investigating claims against Chase, litigating those claims in the United States District Court for the Northern District of California and the Ninth Circuit Court of Appeals, and then litigating those claims to settlement here in Massachusetts. *See* Miller Decl. ¶¶ 10-19, 22 & Ex. A.  He and his associate also prepared pleadings, conducted discovery, reviewed more than 174,000 pages of documents produced by Chase, handled the First Circuit interlocutory appeal, either took or defended numerous depositions across the country, procured an affidavit from William Wise, conferred with experts, and negotiated the settlement, among other things.  *See id.* ¶ 19.

KTT joined the case in November 2016 and immediately took an active role in conducting discovery, researching and drafting key pleadings, motions, and briefs, appearing in court, and negotiating the settlement.  *See* Lifshitz Decl. ¶¶ 5, 10, 12.  Among other things, KTT took and defended depositions, reviewed thousands of pages of documents, worked with Plaintiffs' experts, took the lead in drafting key motions, including researching the motion for class certification and class certification reply, as well as the responses to Chase's motions to strike portions of the class certification motion and Plaintiffs' experts, appeared before the Court to argue those motions, and joined in negotiating the settlement with Chase.  *See id.* ¶ 10.

Taken together, KTT and Keith L. Miller and his associates dedicated more than 5,200 hours to this litigation to date, *see* Lifshitz Decl. Ex. 3, and will devote additional time seeing the

parties' Settlement through to final approval. The considerable time and energy devoted to this matter necessarily limited the time available for other litigation, and Class Counsel, in fact, declined other significant and profitable work in order to give this case the time, effort, and attention it deserved.

### 6. The Awards in Similar Cases

Though a fee equaling 35% of the settlement fund is at the high end of the benchmark in percentage of the fund cases, Class Counsel's request for 35% includes expenses, and a 35% fee is still within the benchmark and is particularly warranted where, as here, the fees awarded to class counsel amount just more than half of counsel's lodestar.[6] *See, e.g., Medoff v. CVS Caremark Corp.*, No. 09-CV-554-JNL, 2016 WL 632238, at *8 (D.R.I. Feb. 17, 2016) (awarding 30% of the common fund in securities fraud class action with 0.9 multiplier); *In re StockerYale, Inc. Sec. Litig.*, No. 1:05CV00177-SM, 2007 WL 4589772, at *6 (D.N.H. Dec. 18, 2007) (awarding 33% of fund in fees with approximate multiplier of 2); *Swack v. Credit Suisse First Boston*, No. 1:02-cv-11943 (D. Mass.) [D.E. 107, 110] (awarding counsel 33% with multiplier approaching 2 in investment fraud class action); *Ahearn v. Credit Suisse First Boston, LLC*, No. 03-cv-10956 (D. Mass.) (33% award); *In re Copley Pharm., Inc. Sec. Litig.*, No. 94-cv-11897 (D. Mass.) (awarding 33-1/3% fee in securities fraud class action). *See also, e.g., Mazola*, 1999 WL 1261312, at *4 (stating, in a class action settlement with a lodestar multiplier approaching 3, "in this circuit,

---

[6] Courts in this Circuit and elsewhere routinely find multipliers from 1 to 4 to be appropriate. *See, e.g., Gordan*, 2016 WL 11272044, at *2 (applying 3.66 multiplier); *In re Relafen*, 231 F.R.D. at 82 ("A multiplier of 2.02 is appropriate."); *In re Cendant Corp.*, 243 F.3d 722, 742 (3d Cir. 2001) (holding that a lodestar multiplier of three would be reasonable and appropriate); *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 408 (D. Mass. 2008) (applying a lodestar multiplier of 1.97); *In re Tyco*, 535 F. Supp. 2d at 271 (applying a lodestar multiplier of 2.697); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.").

percentage fee awards range from 20% to 35% of the fund[, which] mirrors that taken by the federal courts in other jurisdictions."); *Neurontin*, 58 F. Supp. 3d at 172 (citing "empirical study of federal class action fee awards … f[inding] that nearly two-thirds of class action fee awards based on the percentage method were between 25% and 35% of the common fund," in case awarding attorneys' fees with 3.32 multiplier).

A 35% award is particularly warranted here given the time and effort that Class Counsel devoted to the litigation, and the significant hurdles and risks Plaintiffs and the putative class faced had the parties continued to litigate.  Litigation of the claims against Chase began in March 2012, after Class Counsel Miller had completed his extensive and thorough investigation, during which he interviewed more than two hundred witnesses, including Mr. Wise, his attorney, the Hoegels, and hundreds of Millennium investors.  *See* Miller Decl.  ¶ 10; *cf. Gordan*, 2016 WL 11272044, at *2 (crediting class counsel with performing "substantial work for almost a year" prior to filing claims, and awarding fee amounting to 33-1/3% of settlement fund).   Once litigation was underway, Class Counsel exchanged numerous rounds of written discovery with Chase, produced more than 30,000 pages of documents, reviewed more than 174,000 pages of documents, participated in approximately twenty depositions, and briefed motions to dismiss, as well as motions to strike their experts, for a protective order, and for class certification, among others. Miller Decl. ¶ 19; Lifshitz Decl. ¶ 10.  Class Counsel also reviewed documents and depositions from the SEC's case against Wise and the Hoegels, and engaged in months of hard-fought, arm's-length negotiations with Chase in order to reach the terms of the parties' settlement.  *See* Lifshitz Decl. ¶ 10; Miller Decl. ¶ 19.  In 2015, Mr. Miller was also compelled to defend an interlocutory appeal, in which Chase petitioned the First Circuit Court of Appeals and "asked [it] to intervene in what [wa]s essentially a discovery dispute." *In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 37

16

(1st Cir. 2015).   The First Circuit denied Chase's Petition almost five months after Chase had initiated the appeal.   *See id.*

The considerable time and effort Class Counsel dedicated to this litigation warrants the requested 35% fee award, inclusive of expenses, and is in line with the awards in similar cases.

### 7.  Public Policy Considerations

Class counsel invested considerable time, effort, and funds litigating this action to settlement, and securing a favorable result for the Settlement Class, and seek to recover only 63.3% of their lodestar for their hard work.   Class counsel undertook a significant degree of risk in undertaking and continuing to pursue Plaintiffs' claims over the course of six years, knowing that a prior action in California had been dismissed, and understanding all along that they stood to recover nothing for themselves or the class should Chase again prevail.   *See* pp. 11-14, *supra*. Failure to award Class Counsel the requested fee might disincentivize future litigants from assuming similar risks on behalf of defrauded investors. *See, e.g., In re Tyco*, 535 F. Supp. 2d at 270 ("Without a fee that reflects the risk and effort involved in this litigation, future plaintiffs' attorneys might hesitate to be similarly aggressive and persistent when faced with a similarly complicated, risky case and similarly intransigent defendants.") (citing *In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.")).   To be sure, "for cases like this one, in which a satisfactory settlement only became possible after years of hard-fought motion practice and searching discovery, it would be against public policy for me to set an unreasonably low POF award that would encourage future plaintiffs' attorneys to settle too early and too low." *Id.*

17

An award of the fees requested here would be consistent with these important public policy considerations.

**B.    A "Cross-Check" of Class Counsel's Lodestar Confirms the Reasonableness of the Proposed Award.**

While the percentage of the fund method is preferred in common fund cases, the Court may use a lodestar cross-check to confirm the reasonableness of the requested fee.  *See Bezdek*, 79 F. Supp. 3d at 350 ("Although the POF method is generally favored in the class action context because it is less burdensome and 'better approximates the workings of the marketplace,' the First Circuit also recognizes the 'lodestar' method" and may use it "alone or as a check on the appropriateness of a POF calculation.") (citations omitted); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215–16 (D. Me. 2003) ("The lodestar approach (reasonable hours spent times reasonable hourly rates, subject to a multiplier or discount for special circumstances, plus reasonable disbursements) can be a check or validation of the appropriateness of the percentage of funds fee, but is not required.").  To calculate fees under the lodestar method, the court multiplies number of hours reasonably expended on the matter multiplied by counsel's hourly rate.  *See   Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984) ("The 'lodestar'—a threshold point of reference which is subject to additions or deductions for specific reasons—is determined by multiplying the total number of hours reasonably spent by a reasonable hourly rate.") (citations omitted).  "[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998); *see also., e.g., Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 478 F. App'x 54, 60 (4th Cir. 2012) ("[I]n the typical case, an appropriate way to compensate for a delay in payment for attorneys' fees is either to use the current hourly rates instead of historical ones, or to include an award of interest to account for the lost time value of money."); *Johnson v. Univ. Coll.*

*of Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1210-11 (11th Cir. 1983) ("[D]istrict courts should take into account inflation and interest, perhaps by adjusting the contingency factor to reflect delay, not just contingency, or perhaps by compensating at current, not historical, rates.").

Here, over the course of six years, Keith Miller's firm committed a total of 2,545.2 hours to this litigation, at rates of $525 and $325, respectively. *See* Miller Decl. Ex. 1. These rates are eminently reasonable—Mr. Miller has been practicing law for thirty-seven years, has a breadth of legal experience, and has earned an excellent reputation in the community he serves. *See* Miller Decl. ¶ 3 & Ex. 3.

Attorneys at KTT joined Mr. Miller as co-counsel in November 2016, and have since dedicated 2,692.4 hours to the prosecution of Plaintiffs' claims. KTT is among the most prominent firms in South Florida litigating investment fraud claims and class actions, and the attorneys staffed to the case are experienced and highly qualified litigators. *See* Lifshitz Decl. ¶ 3 & Ex. 4. The rates charged by these attorneys—ranging from $800 an hour for the firm's founding partner, Harley S. Tropin to $250 an hour for the firm's junior attorneys—are reasonable rates in the communities KTT serves. *See id.* ¶ 23 & Ex. 1.

Class Counsel's total lodestar in this case is $2,393,912.50. *See* Lifshitz Decl. Ex. 3. When expenses are added to this amount, Class Counsel is due $2,557,155.32 for their efforts. *See id.* Still, Class Counsel seeks only a percentage of that amount in fees and expenses: $1,618,750, which amounts to just 68% of their fee lodestar (an 0.68 multiplier), and just 63.3% accounting for expenses (an 0.63 multiplier). *See id.* Given the skill, effort, and results achieved by Class Counsel, the requested fee is more than justified.

## II.      A Service Award of $25,000 for the Class Representatives Is Appropriate.

The Court should approve a service award of $25,000 for the Representative Plaintiffs. "Plaintiffs in class and collective actions play a crucial role in bringing justice to those who may otherwise have no access to judicial enforcement of their rights." *Lauture v. A.C. Moore Arts & Crafts, Inc.*, No. 17-CV-10219-JGD, 2017 WL 6460244, at *2 (D. Mass. June 8, 2017). "In granting incentive awards to named plaintiffs in class actions, courts consider not only the efforts of the plaintiffs in pursuing the claims, but also the important public policy of fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves." *Bussie v. Allamerica Fin. Corp.*, No. CIV.A. 97-40204-NMG, 1999 WL 342042, at *3 (D. Mass. May 19, 1999)

The Class Representatives in this action have aided in the investigation of claims against Chase, discovery requests, depositions and settlement, all at their financial risk. *See* Miller Decl. ¶ 21.  Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents. *See, e.g., Gordan, supra*,

## **CONCLUSION**

Plaintiffs respectfully request the Court enter an order granting Class Counsel's application for fees and expenses and a $25,000 service award to the Class Representatives.

Respectfully submitted on July 9, 2018.

Respectfully submitted,

*Counsel for Plaintiffs*

By: /s/ Harley S. Tropin
Harley S. Tropin, Esq.
Florida Bar No. 241253
hst@kttlaw.com
Rachel Sullivan, Esq.

Florida Bar No. 815640
rs@kttlaw.com
Tal J. Lifshitz, Esq.
Florida Bar No. 99519
tjl@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone:  (305) 372-1800
Facsimile:   (305) 372-3508

Keith L. Miller
BBO# 347280
Fifty-Eight Winter Street, 4th Floor
Boston, MA 02108
(617) 523-5803

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that this document was filed electronically and sent via email to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 9, 2018.

By: /s/ Harley S. Tropin, Esq.